870 A.2d 307 (2005)
376 N.J. Super. 253
STATE of New Jersey, Plaintiff-Respondent,
v.
William P. DUNCAN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2005.
Decided April 14, 2005.
*308 Ronald K. Chen, argued the cause for appellant (Rutgers Constitutional Litigation Clinic Center for Law & Justice, attorneys; Edward Barocas, American Civil Liberties Union of New Jersey Foundation, of counsel; Mr. Chen and Mr. Barocas, on the brief).
Peter J. Foy, Morris County Assistant Prosecutor, argued the cause for respondent (Michael M. Rubbinaccio, Morris County Prosecutor, attorney; Joseph P. Connor, Jr., Morris County Assistant Prosecutor, on the brief).
Before Judges NEWMAN, AXELRAD, and HOLSTON, JR.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
Defendant William Duncan appeals from a judgment of conviction following a trial de novo in the Law Division on the downgraded charge of harassment, N.J.S.A. 2C:33-4a, in connection with a call he made to 9-1-1. He had initially been charged with N.J.S.A. 2C:33-3e (the fourth-degree offense of knowingly placing a call to 9-1-1 without the purpose of reporting the need for 9-1-1 services), which the prosecutor downgraded to harassment. The Law Division judge sentenced defendant to time served, which was three days in jail.
On appeal, defendant argues:

*309 I. IT WOULD VIOLATE DUE PROCESS AND THE SIXTH AMENDMENT RIGHT TO A JURY TRIAL TO CONSIDER [DEFENDANT]'S USE OF THE 9-1-1 NUMBER AS PART OF HIS OFFENSE
II. [DEFENDANT]'S VERBAL CRITICISM OF THE [MT.] OLIVE POLICE DEPARTMENT DOES NOT CONSTITUTE "HARASSMENT" WITHIN THE MEANING OF N.J.S.A. [ ] 2C:33-4
A. Mere Use of Coarse Language Does Not Constitute the Act of Harassment
1. [Defendant]'s single phone call does not constitute a persistent or systematic pattern of conduct
2. [Defendant]'s single phone call did not cause any emotional distress or anxiety.
3. [Defendant]'s single phone call was not made in any of the proscribed manners listed in N.J.S.A. [ ] 2C:33-4
B. There Is No Evidence on This Record to Establish a "Purpose to Harass"
III. THE FIRST AMENDMENT TO THE CONSTITUTION FORBIDS CRIMINAL SANCTIONS FOR [DEFENDANT]'S EXERCISE OF THE RIGHT TO FREE SPEECH
We agree that defendant's venting of his frustration to the 9-1-1 police dispatcher in crude terms over what he regarded as an improper roadblock, though constituting impolite and rude behavior, did not evidence "a purpose to harass another" within the meaning of N.J.S.A. 2C:33-4. Accordingly, because we are satisfied the record does not support a finding of harassment, beyond a reasonable doubt, we need not address the constitutional challenges asserted by defendant.

I
Early in the afternoon of August 4, 2002, the Mt. Olive Township police conducted a routine inspection detail on westbound Route 46 near the Budd Lake firehouse. Motorists were directed to merge into one lane as they approached the point of inspection; this slowed the approaching traffic to approximately five to fifteen miles per hour. If the officers witnessed a motor vehicle violation, they directed the violator into the firehouse parking lot.
Defendant was driving westbound on Route 46 in the early afternoon hours of August 4, 2002, when he became angered by the presence of the inspection detail. Defendant testified he was following shortly behind an ambulance transporting his eighty-nine-year-old aunt, who had just broken her hip, to a hospital and became upset that what he regarded as an improper roadblock would delay his arrival at the hospital. Defendant pulled over to a pay phone at the nearby Equity Plaza, where, at approximately 1:14 p.m., he called the 9-1-1 emergency number to express his displeasure. Defendant claimed he called that number, rather than the direct line for the Mt. Olive Police, because he did not have a quarter. Dispatcher Andrea Reisen answered the call, and the following exchange occurred:
BEGINNING OF CALL
REISEN: 9-1-1, where is your emergency? DEFENDANT: Is this the Mount Olive Police?
REISEN: What is the emergency?
DEFENDANT: I'm trying to get to the hospital to reach my mother[1] and you mother fuckers have got a road block on 46. You got nothing better to do?

*310 REISEN: Excuse me, sir, I can't hear you.[2]
DEFENDANT: I'm trying to get to my mother. It's an emergency. I'm trying to get to the hospital. I got to wait in a fucking line because you have a fucking road block on 46 chasing, looking at tags. You pricks don't have anything better to do? What is this, a fucking Nazi police state?
REISEN: I'm sorry, sir, I can't hear you.
DEFENDANT: You can hear me just fucking fine.
REISEN: Sir, do you need help?
END OF CALL
Reisen traced the call to the pay phone defendant used and radioed Sergeant Michael Pocquat, a member of the inspection detail, to respond to the scene. Patrol Officer Amy Clymer, another member of the inspection detail, heard Reisen's radio call, looked toward Equity Plaza, and observed defendant on the pay phone. Clymer observed defendant hang up the pay phone, get into a white car, and drive onto westbound Route 46. Clymer radioed Patrolman Luis Sanchez who pursued and stopped defendant's car. When questioned by Sanchez, defendant initially denied being at Equity Plaza and making the 9-1-1 call and claimed that he was coming from a friend's house and was headed to the mall. When Sanchez advised defendant for a second time that his description matched the description of the person who had made the call, defendant admitted making the call. Sanchez testified in municipal court that defendant
rambled on for one or two minutes, saying that we were fucking Nazis, what are we doing stopping cars, searching cars, conducting a roadblock in the State of New Jersey. We had no right to do that. He wanted to speak to the Attorney General. Just rambled on for several minutes.... [H]e continued with[,] you know[,] cursing in regards to being Nazis ...
Sanchez had defendant follow him back to the inspection detail to speak with Pocquat. Defendant admitted to Pocquat he made the 9-1-1 call, claiming he was upset at being delayed on his trip to the hospital. Pocquat testified that when he asked defendant why he further delayed his trip to make the 9-1-1 call and berate the dispatcher, defendant swore at Pocquat and asserted that he "was living in a Nazi state." Pocquat let defendant leave the scene to avoid a confrontation but advised defendant he would review the tape of his 9-1-1 call upon returning to police headquarters and would contact defendant at a later time.
After reviewing the tape of defendant's 9-1-1 call, Pocquat signed a complaint charging defendant with misuse of the 9-1-1 emergency service in violation of N.J.S.A. 2C:33-3e. The Morris County Prosecutor downgraded the charge to the petty-disorderly offense of harassment in violation of N.J.S.A. 2C:33-4a, and it was tried before the Mt. Olive Township Municipal Court. Defendant was convicted on March 29, 2004. He was sentenced to thirty days imprisonment in county jail, a $1,000 fine, and various financial assessments. The municipal judge denied a stay of sentence pending appeal. Defendant appealed to the Superior Court, Law Division pursuant to Rule 3:23. He served three days in jail before being released, pending his appeal, by order of the Law Division judge.
*311 In a de novo trial, the Law Division judge entered a judgment of conviction. He found that defendant had made an anonymous communication in offensively coarse language in violation of N.J.S.A. 2C:33-4a. He further found that defendant made a communication
at extremely inconvenient hours only because it's a 9-1-1 line. That's an emergent line, which is set aside for emergent calls. Any non-emergent call is made at an inconvenient time, and ties up not only the person that receives it, but also the dispatcher, who can no longer address other 911 calls.
The court sentenced defendant to time served, a $400 fine, and statutorily mandated monetary fees. This appeal followed.

II
All of the issues raised by defendant are issues of law. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230, 1237 (1995).
The relevant portion of the harassment statute reads as follows:
[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm.
[N.J.S.A. 2C:33-4 (emphasis added).]
In State v. Hoffman, our Supreme Court held that a violation of subsection (a) requires the following elements:
(1) defendant made or caused to be made a communication;
(2) defendant's purpose in making or causing the communication to be made was to harass another person; and
(3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.
[State v. Hoffman, 149 N.J. 564, 576, 695 A.2d 236, 242 (1997).]
The harassment statute was enacted "to make criminal, private annoyances that are not entitled to constitutional protection." Ibid. (citation omitted). "Thus, the substantive criminal offense proscribed by subsection (a) `is directed at the purpose behind and motivation for' making or causing the communication to be made." Ibid. (quoting State v. Mortimer, 135 N.J. 517, 528, 641 A.2d 257, 262 cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994)). For defendant's conviction to stand, the State must prove, beyond a reasonable doubt, two distinct elements: defendant had the requisite intent to harass and he committed a "free-standing" offense outlined in subsection (a) of the statute. State v. Hoffman, supra, 149 N.J. at 576, 695 A.2d at 242; Peterson v. Peterson, 374 N.J.Super. 116, 123, 863 A.2d 1059, 1064 (App.Div.2004).
Defendant's call was clearly a "communication" within the meaning of the harassment statute. N.J.S.A. 2C:1-14q. "[S]ubsection (a) proscribes a single act of communicative conduct when its purpose is to harass." State v. Hoffman, supra, 149 N.J. at 580, 695 A.2d at 244. Moreover, it was "anonymous" as defendant called from a pay phone and never identified himself. But for the fortuitous circumstance of the phone booth being within the officer's sight at the moment defendant completed his call, his identity probably would not have become known.
*312 We reject the Law Division judge's analysis and alternative finding that the call was made at "extremely inconvenient hours" under the harassment statute merely because it tied up the 9-1-1 line. As the State concedes, by its terms the 9-1-1 emergency line is a twenty-four hour service, thus there may not be an extremely inconvenient hour for a 9-1-1 call.
It is clear from the record that defendant was angry because the police had delayed him. It is also undisputed that defendant expressed his opinion using profanity; in fact, he concedes his language was "crude" and "would probably be deemed objectionable by those subscribing to conventional social norms." The State concedes, however, that profanity, standing alone, does not establish an intent to harass.[3] This is equally true where the language is used in the context of an anonymous phone call. Anonymity or coarse language are necessary elements of the harassment statute but are only part of the picture. The critical element in resolving this case is whether the record supports, beyond a reasonable doubt, a purpose to harass.
A finding that defendant acted with a purpose or intent to harass another is integral to a determination of harassment. State v. Hoffman, supra, 149 N.J. at 576, 695 A.2d at 242; Peterson v. Peterson, supra, 374 N.J.Super. at 123, 863 A.2d at 1063-64; Bresocnik v. Gallegos, 367 N.J.Super. 178, 180, 183, 842 A.2d 276, 278 (App.Div.2004). Here, although the Law Division judge was apparently aware of the relevant law, he made no specific finding of a purpose to harass. He stated
in the sections [of N.J.S.A. 2C:33-4] we note initially that the offense is directed at the purpose behind and motivation for making or causing communications to be made. And a finding of harassment may be inferred from the evidence that's presented, and the approach is to be a common sense one just using experience.
After this general reference to purpose, the judge proceeded directly to a discussion of the substantive conduct proscribed by N.J.S.A. 2C:33-4a, i. e., communications that are anonymous, made at extremely inconvenient hours, or in offensively coarse language. In doing so, the judge inferred a purpose to harass merely because defendant committed one of the stand-alone offenses, thereby eviscerating the intent requirement as an independent statutory element. See State v. Mortimer, supra, 135 N.J. at 536, 641 A.2d at 266-67 ("`With purpose to harass another' imposes a specific-intent requirement on subsection a, thereby clarifying the conduct that subsection a proscribes."); State v. Finance American Corp., 182 N.J.Super. 33, 41, 440 A.2d 28, 32 (App.Div.1981).
"Purposeful" or "with purpose" is the highest form of mens rea contained in our penal code, and the most difficult to establish. Our criminal statute provides:
A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. "With purpose," *313 "designed," "with design" or equivalent terms have the same meaning. [N.J.S.A. 2C:2-2b(1).]
Although we can infer a finding of a "purpose to harass another" "from the evidence presented" and from "common sense and experience," State v. Hoffman, supra, 149 N.J. at 577, 695 A.2d at 242-43, the facts in the present case do not provide support for such a conclusion. It is clear that defendant did not intend to harass anyone. He testified he called 9-1-1 "with the very specific purpose of explaining [his] displeasure with what [he] consider [ed] ... [the police department's] illegal activity" of placing a roadblock on a major highway which slowed him down on the way to a hospital emergency. Defendant further explained, "as coarse as it might be, my intention was not to call them a name ... [T]hat was used as an adjective." The record is bereft of any evidence, as urged by the State, that to retaliate for what he regarded as an unauthorized police delay, defendant called with a purpose to harass the police by tying up the 9-1-1 line with an anonymous phone call, refusing to state whether he was calling to report an emergency, berating the dispatcher and baiting the police to waste their time trying to find him. The State does not claim the obscenities were directed at the dispatcher or that defendant uttered the obscenities with the intent to harass her.
Nor does the dispatcher's reaction to defendant's communication in any way supply a basis to infer that defendant's purpose was to harass her. On the contrary, defendant's call was answered by a seven-year veteran police dispatcher who admitted being trained in dealing with people who are upset, anxious and distressed. The mere exposure to profanity, though irritating to many people, is not necessarily indicative of an intention to harass. The dispatcher described the phone call as "[j]ust a man yelling and he was saying obscene words in reference to a traffic detail that was going on." Although she characterized the call as "very abusive," the dispatcher remained calm and collected and did not appear to be annoyed or distressed at any time throughout the call. When defendant disconnected the call, the dispatcher went about her business following the protocol of tracing the call and radioing a nearby officer to respond to the scene. See State v. Frankel, 179 N.J. 586, 610, 847 A.2d 561, 575 cert. denied, ___ U.S. ___, 125 S.Ct. 108, 160 L.Ed.2d 128 (2004) ("Public safety officials must respond to every open line 9-1-1 call as though a true emergency is unfolding.").
Based on these circumstances, we are convinced an inference cannot be drawn that defendant had the conscious intent to harass the dispatcher or, indirectly, the police officers involved in the roadblock. That is not to say that defendant's conduct was not impolite or vexatious, or that his repetitive use of what is commonly termed a "curse word" was within socially recognized bounds of appropriate language. We are concerned, however, with the dangers of overextending a criminal statute to rude behavior which is not directed towards anyone specifically but only towards an institution in general. Defendant's mere venting of frustration or irritation at the situation is insufficient by itself to constitute harassment under the statute.
Reversed.
NOTES
[1] Defendant testified he was following his aunt; the discrepancy is inconsequential.
[2] Dispatcher Reisen testified she could hear defendant. This was a tactical device by a trained dispatcher for use with an agitated caller to keep him on the line and get whatever help he needed.
[3] See N.J.S.A. 2C:33-2b, Disorderly Conduct (Offensive Language) which was enacted to punish profane speech. It has been held unconstitutional for overbreadth on the ground that one cannot be prosecuted for public use of coarse or abusive language that does not go beyond offending the sensibilities of a listener. State in the Interest of H.D., 206 N.J.Super. 58, 61, 501 A.2d 1016, 1018 (App.Div.1985).