# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2757-19

B.M.O.,

    Plaintiff-Respondent,

v.

P.M.A.,

    Defendant-Appellant.

_____

Submitted March 17, 2021 – Decided April 21, 2021

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FV-09-1183-20.

The Tormey Law Firm, LLC, attorneys for appellant (Brent DiMarco, on the brief).

Fusco & Macaluso, PC, attorneys for respondent (Amie E. DiCola, on the brief).

PER CURIAM

Defendant P.M.A. appeals from a final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1] A Family Part judge entered the FRO based upon his findings defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4, against plaintiff B.M.O., and an FRO is necessary to protect plaintiff from future acts of domestic violence. On appeal, defendant argues there is insufficient evidence supporting the court's finding he committed the predicate act of harassment and that, because he did not commit a predicate act under the PDVA, the court erred by concluding an FRO is necessary to protect plaintiff from future acts of domestic violence. Unconvinced, we affirm.

I.

Plaintiff and defendant dated for two months before ending their relationship in August 2018. They continued to communicate with each other until February 2019. Nine months later, on November 14, 2019, plaintiff filed a complaint and obtained a temporary domestic violence restraining order (TRO) against defendant. Plaintiff amended the complaint twice. The second amended complaint alleged defendant committed the predicate acts of harassment, N.J.S.A. 2C:33-4, and cyber harassment, N.J.S.A. 2C:33-4.1, under the PDVA.

---

[1] We use initials to protect the victim. See R. 1:38-3(d)(10).

N.J.S.A. 2C:25-19(a)(13), (19). In pertinent part, the final amended complaint alleged defendant contacted "individuals close to [plaintiff] to inform the individuals that [plaintiff] is gay," and defendant "'we[a]poniz[ed]' [plaintiff's] sexuality to cause issues" for plaintiff.[2] The complaint also alleged defendant committed prior acts of domestic violence against plaintiff. The court entered a TRO following the filing of each complaint.

At the ensuing trial, plaintiff and defendant offered differing versions of the events leading to plaintiff's filing of his complaints and the court's issuance of the TROs. No other witnesses testified.

Plaintiff testified he ended his two-month dating relationship with defendant in August 2018 because defendant was "aggressive" and "pushy," and wanted plaintiff to "come out" as gay, which made plaintiff feel uncomfortable. Plaintiff stated defendant "wanted [him] to be comfortable with [his] sexuality" and "out [himself] and kind of come out to [his] workplace." According to plaintiff, he told defendant he would "eventually" be comfortable coming out, but "now is not the time." Plaintiff testified defendant tried to "push

---

[2] The final amended complaint also alleged defendant pretended to be plaintiff on online dating applications and sent individuals to plaintiff's residence, and defendant informed plaintiff's former paramour "to come to [plaintiff's] residence, and that [plaintiff] was suicidal." We do not address these claims because they were not prosecuted at trial.

A-2757-19

him . . . into the lifestyle," but he was not "comfortable with it yet." Plaintiff explained that during the time he dated defendant, his family did not know he was gay, and that his family learned he was gay when defendant later outed him to his mother and brother.

Defendant testified he terminated the parties' romantic relationship because plaintiff presented "pieces of untruths" to him. Defendant further stated that, on the first day they met, plaintiff said his family knew he was gay.

After their dating relationship ended, the parties continued to communicate. Plaintiff testified, however, that in October 2018, defendant sent a text message to plaintiff's mother informing her plaintiff is gay. In the message, defendant said plaintiff's mother should have seen "how happy" plaintiff and defendant were while "together" when she was away on vacation, and that she does not deserve a son like plaintiff. The message also stated she is a "bad mother" who "deserves to go to hell." Prior to receiving the message, plaintiff's mother did not know plaintiff was gay. She learned of plaintiff's sexual orientation for the first time when she received defendant's message.

Defendant admitted he sent a text message to plaintiff's mother around October 2018, stating he believed plaintiff was "struggling" and that his mother "should be supportive." Defendant did not deny the message revealed plaintiff's

4

sexual orientation. When asked if the message mentioned plaintiff's sexual orientation to plaintiff's mother, defendant said only he did not "think so." Defendant denied telling her she was a bad mother and an evil person who should go to hell.

Plaintiff testified that at some point between October 2018 and January 2019, defendant also contacted plaintiff's brother. Plaintiff explained that defendant found plaintiff's brother's college email address, and then sent plaintiff's brother emails stating he wanted to speak with plaintiff. In one of the emails, defendant said he was plaintiff's "ex-boyfriend." Defendant also wrote, "I'm serious, I'm only going to be happy when I either see [plaintiff] in jail or when he loses his job. I'm not going to stop." Plaintiff's brother did not know plaintiff was gay until defendant communicated with him. When defendant testified, he did not deny contacting plaintiff's brother.

Plaintiff testified that in January 2019, the parties exchanged text messages, copies of which were admitted in evidence. In these exchanges, plaintiff told defendant, "You are going to[o] far to insert yourself back into my life," "you need to go away," "I am out of your life," and "stop contacting my family." In some text messages, plaintiff commented on defendant "[g]oing out of [his] way to find [plaintiff's] brother[']s school email." Plaintiff told

defendant via text message to "stop contacting [his] brother" and advised that his brother was "set on going to the police for harassment." During the exchange of messages, plaintiff said, "I need to be alone . . . Okay?," and, in response, defendant said, "No it's not okay."

In one message, plaintiff told defendant not to talk to him "ever again," and not to contact his mother. Plaintiff also threated to "hunt [defendant] down" and "beat the shit out of [him]." Plaintiff testified he sent the latter message because he "was so angry and so hurt" by defendant's previous communications and because of defendant's message to plaintiff's mother.

Plaintiff also testified that in February 2019, defendant sent a package to the apartment plaintiff shared with his father, but there was no addressee identified on the package. The package contained "gummy worms shaped like penises" and a message stating, "I know how much you like random dicks in your mouth." After receiving the package, plaintiff advised defendant not to contact him again. Defendant admitted sending the package and note, but said it was because plaintiff was "catfishing" him, meaning plaintiff had interacted with defendant online while posing as another person.

Plaintiff testified that in October 2019, defendant began sending pictures of plaintiff to plaintiff's relatives and former paramours with text messages

6

stating, "[T]his person is gay[,] and he likes sleeping with men, I've had sex with him multiple times." In November 2019, defendant exchanged messages with plaintiff's cousin via Instagram and sent her a picture of plaintiff captioned with the words, "I have sex with men." A copy of the messages was admitted in evidence, and plaintiff testified the messages to plaintiff's family and former paramours stopped after he obtained the TRO against defendant.

Defendant denied creating the Instagram account that was used to exchange the messages with plaintiff's cousin. He also denied seeing the messages until the exhibit containing them was provided during discovery.

Defendant testified he contacted plaintiff and plaintiff's family because he was afraid following an incident in January 2019. Defendant explained he saw plaintiff one evening, and plaintiff appeared "panicky" and told defendant "he was scared for his life due to a case he was involved in [for his job]." Defendant testified that plaintiff, who works for the Department of Justice, said plaintiff was being followed. Defendant said he tried to calm plaintiff down and then drove plaintiff home. Defendant testified that as a result of his interaction with plaintiff, he was fearful and continued to express his fears to plaintiff.

Plaintiff testified defendant was "paranoid" because of plaintiff's job, and that defendant "thought that people were out to get him, which [was] untrue."

7

During the parties' text message exchanges in January 2019, plaintiff assured defendant he was not in any danger, but plaintiff told defendant he could be charged with "obstruction" if his actions caused plaintiff to "underperform" his job duties because plaintiff was working on "a sensitive case."

The reasons for defendant's alleged fears are not clear from the record. We discern, however, that he claimed he was fearful based on his understanding of plaintiff's job duties, which are not described in the record. Plaintiff testified he shared information about his job with defendant, and, in February 2019, defendant contacted plaintiff's employer and revealed the information. Plaintiff also testified defendant informed his employer about personal matters between himself and defendant. As a result of the information defendant shared with plaintiff's employer, plaintiff was subject to disciplinary action.

In an opinion from the bench, the court found plaintiff's testimony more credible than defendant's version of the events. In support of its credibility determination, the court relied on plaintiff's demeanor while testifying, and the court found the text messages corroborated plaintiff's version of the events. The court also found the text messages and plaintiff's credible testimony established defendant created the "scenario in his own head that he was at risk . . . [and] that his life was in danger." The court determined there was no credible evidence

supporting defendant's professed fear because he admitted, "Nobody contacted him, [n]obody threatened him, [and n]obody followed him . . . ."

The court determined "defendant essentially outed plaintiff's sexual preference" to plaintiff's mother and brother. The court further found that despite plaintiff telling defendant to leave him alone multiple times, and to not contact his employer, defendant sent plaintiff a package of gummy worms shaped like penises and a note saying, "I know how much you like random dicks in your mouth," contacted plaintiff's employer, and sent messages to plaintiff's family outing plaintiff as a gay man.

The court acknowledged defendant's claim he was afraid and believed his life was in danger, but it determined that, despite what defendant purportedly believed, the evidence established defendant purposely harassed plaintiff by making the various communications to plaintiff's family and employer. The court accepted plaintiff's testimony that defendant threatened he would not "stop until . . . plaintiff was in jail or lost his job." Although not precisely articulated, we understand that the court found defendant committed predicate acts of harassment by making communications in a manner likely to cause annoyance or alarm, N.J.S.A. 2C:33-4(a), and by engaging in a course of conduct with the purpose to cause alarm or seriously annoy plaintiff of harassment, N.J.S.A.

9

2C:33-4(c). The court also determined an FRO "is necessary to stop these types of follow-up communications from . . . defendant."

The court entered an FRO against defendant. This appeal followed.

II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div.) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)), certif. denied, 244 N.J. 339 (2020). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and

will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

To determine whether the entry of an FRO is appropriate, the court must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set

forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also J.D., 207 N.J. at 475-76.

Defendant claims there is insufficient evidence supporting the court's finding he committed predicate acts of harassment. More particularly, he argues the record lacks evidence he acted with the purpose to harass plaintiff. Defendant further argues his communications with third parties do not support a finding he acted in a manner likely to cause annoyance or alarm to plaintiff in violation of N.J.S.A. 2C:33-4(a), or that he engaged in a course of alarming conduct or repeatedly committed actions with the purpose to cause alarm or seriously annoy plaintiff in violation of N.J.S.A. 2C:33-4(c).

Although harassment is "one of the most frequently reported" predicate acts of domestic violence, it also "presents the greatest challenges to our courts." J.D., 207 N.J. at 475. A harassment claim presents such a challenge because it "confounds [the court's] ability to fix clear rules of application" between "acts that constitute harassment" and acts that are "ordinary domestic contretemps." L.M.F. v. J.A.F., 421 N.J. Super. 523, 534 (App. Div. 2011) (quoting J.D., 207 N.J. at 475). To determine whether conduct constitutes harassment in the domestic violence context, a court must consider the parties' prior relationship.

12

Cesare, 154 N.J. at 405. Only by considering the parties' prior relationship and the parties' conduct under the totality of the circumstances can a court determine whether a communication constituted harassment. Compare Pazienza v. Camarata, 381 N.J. Super. 173, 182-84 (App. Div. 2005) (finding, based on the defendant's repeated prior unwanted contact with the plaintiff, that a single text message to the plaintiff about the show she was watching at the moment defendant sent the text message constituted harassment), with L.M.F., 421 N.J. Super. at 535-37 (holding an isolated incident of the defendant making a remark to the plaintiff when he was angry and they were divorcing was not harassment under the circumstances).

In relevant part, a person commits the offense of harassment

if, with purpose to harass another, he [or she]:

(a) [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

. . . or

(c) [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

Critical to this analysis is whether the defendant's actions were taken with a purpose to harass. R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017). "'[P]urpose' is the highest form of mens rea contained in our penal code, and the most difficult to establish." State v. Duncan, 376 N.J. Super. 253, 262 (App. Div. 2005). "A person acts purposely with respect to the nature of his [or her] conduct or a result thereof if it is his [or her] conscious object to engage in conduct of that nature or to cause such a result." Ibid. (quoting N.J.S.A. 2C:2-2(b)(1)). We may infer "a 'purpose to harass another' 'from the evidence presented' and from 'common sense and experience.'" Ibid. (quoting Hoffman, 149 N.J. at 577).

We first address defendant's claim plaintiff did not prove by a preponderance of the evidence defendant committed the predicate acts of harassment under N.J.S.A. 2C:33-4(a) and (c).[3] The focus of the court's analysis under subsection (a) is "the mode of speech employed" by the defendant. Hoffman, 149 N.J. at 583. The "communication [must have] been made

---

[3] We do not address the claim, asserted in plaintiff's complaint, that defendant committed the predicate act of cyber harassment in violation of N.J.S.A. 2C:33-4.1. The court did not make any findings concerning a violation of the statute, and the FRO states only that the court found defendant committed the predicate act of harassment. Plaintiff does not appeal from the court's failure to address his cyber harassment claim under N.J.S.A. 2C:33-4.1, and he does not claim on appeal the court erred by failing to find a predicate act of cyber harassment.

anonymously, at an extremely inconvenient hour, in coarse or offensive language, or in a similar fashion." J.D., 207 N.J. at 477. "[C]ommunications that . . . are invasive of the recipient's privacy" fall within subsection (a). Hoffman, 149 N.J. at 583. One single communication can suffice so long as it was made with the purpose to harass and "in a manner likely to cause annoyance or alarm to the intended recipient." J.D., 207 N.J. at 477. Under subsection (a), "[a]nnoyance means to disturb, irritate, or bother." Ibid. (alteration in original) (quoting Hoffman, 149 N.J. at 580).

We have held that egregious communications sent to third parties with the purpose to harass the victim constitute harassment under N.J.S.A. 2C:33-4(a). In McGowan v. O'Rourke, we sustained the defendant's conviction under N.J.S.A. 2C:33-4(a) where he committed a single "act of mailing graphic pornographic pictures to a third-party and implying that they may be sent to the victim's workplace and her son." 391 N.J. Super. 502, 506 (App. Div. 2007).

N.J.S.A. 2C:33-4(c) "requires proof of a course of conduct." State v. Burkert, 444 N.J. Super. 591, 600 (App. Div. 2016) (quoting J.D., 207 N.J. at 478), aff'd, 231 N.J. 257 (2017). The conduct must be "alarming" or "a series of repeated acts . . . done with the purpose 'to alarm or seriously annoy' the intended victim." Ibid. (alteration in original) (quoting J.D., 207 N.J. at 478).

"Serious" annoyance or alarm means "to weary, worry, trouble or offend." J.D., 207 N.J. at 478 (quoting Hoffman, 149 N.J. at 581). Where the alleged alarming conduct or repeatedly committed acts consist of "pure expressive activity," subsection (c) requires that the "repeated communications" "reasonably put [the intended target] in fear for his [or her] safety or security or . . . intolerably interfere with [the intended target's] reasonable expectation of privacy." State v. Burkert, 231 N.J. 257, 284-85 (2017).

Here, the evidence amply supports the court's finding defendant made communications likely to cause or annoyance or alarm and, at the same time, engaged in a course of alarming conduct and repeatedly committed acts with the purpose to alarm and seriously annoy plaintiff. Defendant's purpose is established by his own words. He told plaintiff's brother that if plaintiff continued to refuse to speak with him, he would not stop his communications about plaintiff until plaintiff lost his job or was in jail. Defendant engaged in a course of conduct over a one-year period that is consistent with his stated intentions and that he knew would worry, trouble, or offend plaintiff. See J.D., 207 N.J. at 478.

Plaintiff's dating relationship with defendant ended because defendant pushed plaintiff to openly disclose his sexual orientation to his family and

16

others. Plaintiff resisted, telling defendant he was not comfortable revealing his sexual orientation at that time. Defendant's response to plaintiff's decision to end their relationship was to attempt to exercise power over plaintiff by controlling the disclosure of a matter—plaintiff's sexual orientation—about which plaintiff requested, and was entitled to, privacy. As plaintiff aptly alleged in his complaint, defendant weaponized the disclosure of plaintiff's sexual orientation in response to being rebuffed and rejected.

Defendant also knew disclosure of plaintiff's sexual orientation to his family and others would cause plaintiff annoyance and alarm. Plaintiff told defendant so while they dated by explaining he was not comfortable revealing his sexual orientation and by ending their relationship in response to defendant's aggressive "push" that plaintiff come out as a gay man. Defendant's unilateral and unauthorized disclosure of plaintiff's sexual orientation to plaintiff's mother and brother, and later to plaintiff's cousin, constituted an abhorrent assault on plaintiff's privacy that was clearly intended to cause plaintiff serious annoyance and alarm. In our review of the record, and applying simple common sense, there is no rational explanation for defendant's actions other than that he acted with a purpose to cause plaintiff serious annoyance and alarm. See Duncan, 376 N.J. Super. at 262 (permitting inference of purpose to harass based on the

evidence and common sense and experience). His communications disclosing plaintiff's sexual orientation served no other purpose.

Defendant's decision to send a package to the apartment plaintiff shared with his father was also part of a course of conduct intended to annoy or alarm plaintiff. The package was sent after numerous communications from plaintiff asking defendant to stay out of his life. The package was addressed to the apartment, but it did not identify the intended recipient. Plaintiff received it, and opened it, but the manner in which it was sent, its contents, and the vulgar note that was included constitute an alarming, annoying, and disturbingly ominous message that defendant was fixated on plaintiff's sexual orientation and was willing to disclose plaintiff's sexual orientation to any family member who might have opened the package at plaintiff's home.

Defendant's course of conduct also included contacting plaintiff's employer in February 2019. The contact was consistent with his vow to continue to do what he was doing until plaintiff lost his job or was in jail.[4] As the court

---

[4] Defendant also followed through on this threat to attempt to place plaintiff in jail. He testified that in June 2019, he filed "criminal charges" against plaintiff in the Jersey City municipal court. He also testified the charges were subsequently dismissed. Defendant further acknowledged he applied for a domestic violence TRO against plaintiff in June 2019, but the court denied his request.

found, there was no credible evidence supporting defendant's purported fear related to plaintiff's employment. Nonetheless, six months after plaintiff ended the parties' dating relationship, and following plaintiff's ongoing requests that defendant leave him alone and stay out of his life, defendant contacted plaintiff's employer, communicated information plaintiff had shared about his work, and disclosed personal information about plaintiff and defendant. The result of defendant's contact with the employer was disciplinary action against plaintiff.

Defendant's course of conduct continued in November 2019, when he sought out plaintiff's cousin and sent her a photograph of plaintiff with a caption stating plaintiff had sex with men. There is no evidence the message was solicited by plaintiff's cousin. Instead, fifteen months after plaintiff ended his dating relationship with defendant, and following plaintiff's repeated requests to be left alone, defendant gratuitously forwarded a message outing plaintiff as a gay man to plaintiff's cousin.

Defendant claims the communications were made because he feared for his life, but the court did not find defendant credible and, instead, concluded that regardless of the purported fear, defendant's purpose was to cause plaintiff serious annoyance or alarm. Defendant's claim he was motivated by fear is undermined by the record; the first act in defendant's course of conduct—his

19

October 2018 communication to plaintiff's mother—was sent months before the January 2019 incident defendant claims caused his alleged fear. We defer to the court's credibility findings and find there is substantial, credible evidence, see Cesare, 154 N.J. at 411-12, supporting the court's conclusion defendant committed predicate acts of harassment in violation of N.J.S.A. 2C:33-4(a) and (c). The evidence established that, with a purpose to harass plaintiff, defendant made a series of communications over a thirteen-month period that were likely to cause annoyance and alarm, and, at the same time, defendant engaged in a course of alarming and seriously annoying conduct.

A finding that a defendant committed a predicate act does not "automatically mandate[]" the entry of an FRO. Silver, 387 N.J. Super. at 126-27. Where a predicate act is found, the evidence must establish the defendant "subjected [the victim] to potential abusive and controlling behavior" as a result of the parties' previous domestic relationship. R.G., 449 N.J. Super. at 229. "Although a defendant might not use direct physical violence when he or she engages in the predicate act[] of harassment, N.J.S.A. 2C:33-4, . . . [this] act[] can cause great emotional harm and psychological trauma." A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016). "Thus, we must never lose sight of Justice O'Hern's admonition that 'there is no such thing as an act of domestic

violence that is not serious.'" Ibid. (quoting Brennan v. Orban, 145 N.J. 282, 298 (1996)); see, e.g., McGowan, 391 N.J. Super. at 505-06 (granting an FRO to a plaintiff notwithstanding the lack of a history of domestic violence because the defendant engaged in a single "egregious" act of harassment in violation of N.J.S.A. 2:33-4(a)).

Defendant argues the court erred by finding plaintiff requires an FRO to prevent future acts of domestic violence because he did not commit a predicate act of domestic violence in the first instance. We reject the claim for the reasons already stated.

We also reject defendant's argument his conduct was part of mere "ordinary domestic contretemps," Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div. 1995), and were "trivial and petty communications between separated" parties, J.N.S. v. D.B.S., 302 N.J. Super. 525, 532 (App. Div. 1997). Of course, ordinary disputes between parties do not constitute domestic violence and therefore do not warrant issuance of an FRO. J.D., 207 N.J. at 475-76.

Defendant's argument ignores that his communications disclosing plaintiff's sexual orientation occurred after plaintiff ended their romantic relationship, and many followed plaintiff's pleas that defendant leave him and his family alone. Defendant's actions were not domestic contretemps; they

21

comprised a consistently-executed effort to disclose private and sensitive information that defendant knew plaintiff did not want shared and understood would cause plaintiff emotional harm. Defendant's communications concerning plaintiff, individually and collectively, constitute domestic violence. See, e.g., McGowan, 391 N.J. Super. at 506. And, defendant's stated intention he would continue to make the communications and would "not stop" until he caused plaintiff harm, and defendant's unrelenting course of conduct directed at plaintiff over a period of thirteen months despite plaintiff's requests that he stop, amply support the court's finding an FRO is necessary to protect plaintiff against future acts of domestic violence.

Any arguments asserted on defendant's behalf that we have not addressed directly are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-2757-19