**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2589-24

C.N.C.,[1]

    Plaintiff-Respondent,

v.

C.J.C.,

    Defendant-Appellant.

_____

          Submitted November 18, 2025 – Decided December 9, 2025

          Before Judges Firko and Perez Friscia.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FV-15-1164-25.

          SeidenFreed LLC, attorneys for appellant (Victoria D. Miranda, of counsel and on the brief; Christine C. Fitzgerald, on the brief).

          Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to identify the parties in accordance with Rule 1:38-3(d)(10).

Defendant C.J.C. appeals from a March 12, 2025 final restraining order (FRO) entered in favor of C.N.C., his wife, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on the predicate act of harassment, N.J.S.A. 2C:33-4. After considering the record in light of the parties' arguments and the applicable law, we affirm the FRO because the Family Part judge's factual findings are supported by substantial credible evidence and she correctly applied the law.

## I.

In her domestic violence complaint, plaintiff alleged that on December 28, 2024, defendant—her estranged husband—turned off the internet, which disabled the security system at her home, where she resides with the parties' two children and plaintiff's child from a prior marriage. Plaintiff also alleged that defendant turned off her cell phone on December 19, 2024, before she was planning to take a vacation to Disney World. Plaintiff claimed the OnStar tracking system on her vehicle had been enabled, presumably by defendant, so he could track her whereabouts in Florida. Plaintiff rented a vehicle to avoid defendant tracking her vehicle.

In terms of prior history, plaintiff alleged there was an extensive reported and unreported domestic violence history. The complaint alleged the predicate

2

act of harassment.  Plaintiff sought and was granted a temporary restraining order (TRO), which ordered defendant to have no contact with her or the three children, barred him from the former marital residence, and plaintiff's place of employment.

On January 10, 2025, plaintiff filed an amended complaint to add additional allegations of harassment.  Plaintiff alleged that on December 17, 2024, defendant repeatedly logged into her Netflix account to delete profiles and change passwords.  In the days that followed, plaintiff alleged defendant remotely logged into her electronic devices to prevent usage.

The amended complaint also included specific prior domestic violence incidents.  On July 4, 2024, plaintiff obtained a TRO against defendant due to his verbal, electronic, and financial harassment.[2]  Plaintiff alleged defendant destroyed her catheter shipment having an estimated value of $1,400, tracked her vehicle, and sent her harassing text messages, including one admitting to a physical assault.  In addition, plaintiff alleged defendant left her an alarming note at her house expressing suicidal ideation.  In January 2024, plaintiff

---

[2]  Docket number FV-15-0031-25.  As stated in this opinion, the TRO was dismissed following a trial.

claimed defendant was removed from the home due to his increased aggression, and he was not compliant with his bipolar medication.

In June 2023, plaintiff alleged defendant physically restrained her from obtaining a cell phone, then threw her down a flight of stairs, resulting in bruises and injuries. In January 2019, plaintiff alleged defendant refused to allow her to recover from brain surgery by preventing her from sleeping. Plaintiff claimed defendant was verbally abusive. In 2016, plaintiff alleged defendant broke down a door, wrestled plaintiff for a cell phone, and threw her into a wall, causing injuries. According to plaintiff, defendant has broken house and vehicle windows, household items, and punched holes in walls. Plaintiff did not report these incidents out of "fear" because defendant is a Sheriff's officer.

On February 20, 2025, plaintiff filed another amended complaint to include subsequent acts of domestic violence committed by defendant after issuance of the TRO. Plaintiff alleged defendant used his Walgreens' account to electronically cancel her medication refills and electronically disabled the remaining SIM card[3] on her cell phone multiple times.

___

[3] SIM here refers to a "Subscriber Identity Module," which is a small card or embedded chip that "store[s] the subscriber's identification data, including the phone number to identify a user to a mobile network." U.S. v. Jackson, 364 F. App'x. 776, 779 (3d Cir. 2010).

A-2589-24

At trial, both parties were self-represented.  Plaintiff testified about the parties' relationship and the allegations in the complaints.  She explained that the parties were in the midst of divorce proceedings.  Plaintiff described the December 19, 2024 incident when she discovered her cell number had been turned off and one of the children's cell phones had also been turned off on the day they were leaving for a vacation.  Plaintiff testified she went to a T-Mobile store and learned that the cell number had actually been cancelled.  Plaintiff explained defendant was supposed to go on the trip to Disney World so he knew the dates when plaintiff would be travelling.

Plaintiff testified this caused an "annoyance" to her and was also "extremely alarming" because she would be traveling without a cell phone.  Upon returning home, plaintiff stated defendant contacted T-Mobile and had the home internet service turned off, and he stopped paying the Slomin's home security system bill.  Plaintiff testified that at the last trial, defendant became aware that she had a Ring security system, which requires internet service.  Plaintiff explained her prior TRO was dismissed because the judge found defendant's actions in July 2024, did not rise to the level of harassment but noted the "extensive history of domestic violence at the hands of [defendant]."

A-2589-24

Subsequent to the December 19, 2024 incident, plaintiff testified defendant continued to harass and annoy her. In particular, plaintiff stated on three occasions, defendant went to T-Mobile "in the middle of the night" and had her cell phone turned off. Plaintiff explained that the parties' then nine-year-old child had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and was experiencing "a lot of undue stress" regarding parenting time with defendant.

Plaintiff testified that defendant's behavior and "paranoia" resulted from his decision to stop taking his bipolar medication. According to plaintiff, defendant was diagnosed with bipolar II disorder in December 2022, by his psychiatrist and was prescribed anti-psychotic and anti-depressant medications. In June 2024, plaintiff testified that defendant stopped taking his medication and he began exhibiting "erratic behavior[]." By way of example, plaintiff explained that when she returned home from a paralympic swim team competition in Europe, she found the home "completely disheveled" and "alcohol bottles all over the place." Plaintiff was concerned because defendant had been sober. Plaintiff stated the house and dogs were infested with fleas, defendant "moved money around," and spent money erratically, leading to the issuance of the TRO in July 2024.

6

In terms of prior history, plaintiff testified about defendant's affairs with numerous women, resulting in the physical altercations alleged in the complaint. Plaintiff testified defendant was under investigation by internal affairs for allegedly not following procedures relative to employees with mental health issues. He was actively drug tested by internal affairs to ensure he was compliant with his medications. Plaintiff cooperated with internal affairs and believed defendant "retaliated" against her as a result.

Because defendant terminated her cell phone service, plaintiff testified she "lost out on job opportunities," missed a mandatory drug test required as she is a professional athlete, and missed a call from her doctor informing her that her biopsy came back malignant. Plaintiff testified she underwent brain surgery in 2019 for cancer, and because of her physical limitations, she can no longer protect herself from defendant.

At trial, plaintiff showed the judge images on her electronic devices—laptop and iPad—depicting injuries to her leg, forehead, and mouth, related to the September 2016 incident. In addition, plaintiff showed the judge images of a damaged lock to the bathroom door defendant tried to pry open and boot marks on the door caused by his attempts to kick it open. These images were located on plaintiff's Google account. The photographs were marked for identification

7

and shown to defendant, but no copies were provided. Plaintiff also provided autogenerated text messages from T-Mobile confirming the SIM card was disabled and defendant's request to T-Mobile to cancel plaintiff's phone number on December 19, 2024. Plaintiff also introduced images depicting a destroyed shipment of her catheters and medical equipment.

Defendant testified he has not had physical contact with plaintiff since October 2024, and has only communicated through AppClose to discuss the children. Regarding the shutdown of the phone and internet services, defendant testified the TRO caused him a "complete hardship financially" because he can no longer work overtime. Defendant claimed his attorney advised him that he only had to pay for health and car insurance.

Defendant denied tracking plaintiff's car and claimed he only used the "My Chevy" application to start the car or regulate the temperature. He testified he was only trying to retrieve his Netflix account because it became part of the T-Mobile account plaintiff put under her own name. Defendant testified he paid for all the streaming accounts but discontinued them because he could no longer afford them.

A-2589-24

Defendant testified he has anxiety and ADHD but has never been diagnosed as bipolar. According to defendant, he stopped taking his anxiety medication based on his psychiatrist's orders.

Defendant denied throwing plaintiff down the stairs and testified the parties "fell down the stairs together." Defendant stated plaintiff misstated the purpose of the internal affairs investigation, which was solely to determine whether he should regain the service weapon he lost on account of the previous TRO. Defendant claimed internal affairs cleared him "multiple times," and he complied with drug testing. Defendant stated plaintiff is the one suffering with mental health issues as she has a history of inflicting self-harm, has been evaluated at a psychiatric hospital, and had suicidal thoughts. Defendant denied intentionally destroying the catheters and cleaned the house after learning there was a flea issue.

Defendant testified plaintiff continually interfered with his parenting time. To corroborate his testimony, defendant moved the parties' AppClose messages into evidence. Defendant testified he believed plaintiff has tracked him by monitoring their son's phone and that she slanders defendant "all over social media."

A-2589-24

On cross-examination, defendant testified he did not recall the dates of the Disney World trip, and the dates were not on his calendar because the parties were no longer together. Plaintiff confronted defendant with a text message dated December 6, 2023, providing him with dates for the year regarding her vacation plans. Defendant testified he did not shut down the children's cell phones because he was unaware of them.

After considering the parties' testimony and evidence, the judge rendered an oral opinion. The judge found jurisdiction was established under the PDVA because the parties are married with children. The judge determined plaintiff was "forthright," and defendant was "not credible." The judge reasoned the text messages demonstrated that defendant "absolutely knew of the dates and of the trip." The judge found defendant's testimony that he turned off the cell phones based on financial hardship was "not credible" because there was no excuse to shut down services for plaintiff and the children, such as security cameras, which ensure the children's safety.

The judge emphasized defendant was also not credible because he never attempted to discuss his inability to continue paying for cell phones or internet services with plaintiff through AppClose or her counsel. The judge rejected defendant's testimony he "stayed away" from plaintiff because he was able to

10

access things remotely at inconvenient hours, such as Netflix, OnStar, and the My Chevy App.

In contrast, the judge found plaintiff "wholly credible," noting she was "tearful," "honest," and "resolute" in describing the present and prior acts of domestic violence, including a physical act when she discovered defendant's affair. The judge found plaintiff proved the predicate act of harassment because disconnecting phones pertaining to plaintiff and the children at 2:00 a.m. constituted annoyance or alarm at an inconvenient hour. The judge found the first prong under Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006) was satisfied. In analyzing the second Silver prong, the judge determined plaintiff requires the protection of an FRO to prevent future acts of domestic violence by defendant. This appeal followed.

Before us, defendant primarily raises two arguments. First, he contends the FRO should be vacated because he did not commit the predicate act of harassment. Second, defendant maintains the judge abused her discretion by not adjourning the FRO hearing after learning plaintiff was not in possession of hard copies of her evidence thereby depriving him of his due process rights.

II.

Our review of a trial court's decision to enter an FRO in a domestic violence matter is limited. Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005). "A reviewing court is bound by the trial court's findings 'when supported by adequate, substantial, credible evidence.'" Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "This deferential standard is even more appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"Reversal is warranted only when a mistake must have been made because the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice. . . .'" Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we review de novo "the trial judge's legal conclusions, and the application of those conclusions to the facts." Ibid. (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

In adjudicating a domestic violence case, the trial judge has a "two-fold" task. Silver, 387 N.J. Super. at 125. "First, the judge must determine whether

12

the plaintiff has proven, by a preponderance of the credible evidence," that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a), which includes harassment, N.J.S.A. 2C:33-4, as conduct constituting domestic violence. Ibid. The judge must construe any such acts in light of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." Kanaszka v. Kunen, 313 N.J. Super. 600, 607 (App. Div. 1998); see N.J.S.A. 2C:25-29(a)(1).

A finding of harassment requires proof that the defendant acted "with purpose to harass." N.J.S.A. 2C:33-4; see Silver, 387 N.J. Super. at 124. Although a purpose to harass may, in some cases, be "inferred from the evidence," and may be informed by "[c]ommon sense and experience," a finding by the court that the defendant acted with a purpose or intent to harass another is integral to a determination of harassment. State v. Hoffman, 149 N.J. 564, 577 (1997).

We note that purposeful conduct "is the highest form of mens rea contained in our penal code, and the most difficult to establish." State v. Duncan, 376 N.J. Super. 253, 262 (App. Div. 2005) (emphasis omitted). Its establishment requires proof, in a case such as this, that it was the actor's

"conscious object to engage in conduct of that nature or to cause [the intended] result." N.J.S.A. 2C:2-2(b)(1). A plaintiff's assertion that the conduct is harassing is not sufficient. J.D. v. M.D.F., 207 N.J. 458, 484 (2011). Further, a "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487.

When deciding the issues of intent and effect, we are mindful of the fact that:

> harassment is the predicate offense that presents the greatest challenges to our courts as they strive to apply the underlying criminal statute that defines the offense to the realm of domestic discord. Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of "ordinary domestic contretemps," . . . presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application.
>
> [Id. at 475 (citation omitted).]

"[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." Id. at 484.

If a predicate offense is proven, the judge must then assess "whether a restraining order is necessary, upon an evaluation of the [factors] set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)[(7)], to protect the victim from an immediate danger or to prevent further abuse." Id. at 475-76 (quoting Silver, 387 N.J.

14

Super. at 127).  The factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety;
>
> (6) The existence of a verifiable order of protection from another jurisdiction; and
>
> (7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse.  If the court finds that one or more factors of coercive control are more or less relevant than others, the court shall make specific written findings of fact and conclusions of law on the reasons why the court reached that conclusion.  Coercive control may include, but shall not be limited to:
>
>> (a) isolating the person from friends, relatives, transportation, medical care, or other source of support;

(b) depriving the person of basic necessities;

(c) monitoring the person's movements, communications, daily behavior, finances, economic resources, or access to services;

(d) compelling the person by force, threat, or intimidation, including, but not limited to, threats based on actual or suspected immigration status;

(e) threatening to make or making baseless reports to the police, courts, the Division of Child Protection and Permanency (DCPP) within the Department of Children and Families, the Board of Social Services, Immigration and Customs Enforcement (ICE), or other parties;

(f) threatening to harm or kill the individual's relative or pet;

(g) threatening to deny or interfere with an individual's custody or parenting time, other than through enforcement of a valid custody arrangement or court order pursuant to current law including, but not limited to, an order issued pursuant to Title 9 of the Revised Statutes; or

(h) any other factors or circumstances that the court deems relevant or material.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all of these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence

between the parties.'" Cesare, 154 N.J. at 402 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment[,] and physical abuse," and on "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

The court must exercise care "to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente, 281 N.J. Super. at 250. Rather, "[t]he [PDVA] is intended to assist those who are truly the victims of domestic violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)).

## III.

Defendant argues the evidence did not establish a pattern of conduct with the purpose to harass. Citing Corrente, defendant maintains he cancelled the T-Mobile account without notifying plaintiff because of financial hardship as a

result of the ongoing divorce matter, not to harass her. 281 N.J. Super. at 250. Defendant asserts plaintiff was "not harmed by this act" and was able to obtain a new phone that morning before leaving with the children for Disney World. He points out plaintiff did not testify the 2:00 a.m. text message from T-Mobile awakened her or that she saw it in the middle of the night. Defendant further argues he had no contact or communication with plaintiff that day, and there was no evidence of violence. We reject these arguments.

We are satisfied the judge's conclusion that defendant harassed plaintiff, as defined under N.J.S.A. 2C:33-4, was based upon substantial, credible evidence in the record. That evidence amply supports the finding that defendant possessed the intent to harass plaintiff based on her credible testimony she received a text message at an inappropriate hour and had to get another SIM card to turn the phones on. We discern no grounds for disagreeing with the trial judge that defendant's attempts to access and shut down plaintiff's cell phone, internet, security system, My Chevy application, and Netflix—among others—at inconvenient hours constituted harassment. Indeed, defendant's purpose is established by his incredulous testimony about ostensibly not knowing the dates of plaintiff's trip and never discussing his inability to pay for the stated services with her.

The record establishes that defendant "made or caused to be made communications" to plaintiff in a "manner likely to cause annoyance or alarm" under N.J.S.A. 2C:33-4(a). The judge did not identify subsection (a) in her opinion, but she cited the language contained in subsection (a). Moreover, contrary to defendant's assertion, subsection (a) does not require direct communication with the victim. Here, it is irrelevant that defendant did not directly make the communication because his scheduled shutdown of plaintiff's cell phone led to T-Mobile communicating with her at 2:00 a.m. on the morning before she left for Disney World. The communication of notice that plaintiff would have no cell phone access before leaving on a long trip is a "manner similarly likely to cause annoyance or alarm to its intended recipient." Hoffman, 149 N.J. at 576.

The record also establishes that defendant engaged in a course of abusive conduct over several years. See J.D., 207 N.J. at 478. Plaintiff testified to multiple instances in which defendant assaulted her, resulting in physical injuries and property damage. We also consider significant the judge's amply supported finding on the seriousness of the predicate offense including previous harassment and physical abuse. The judge issued the FRO to protect plaintiff from future acts of domestic violence. The record indicates defendant harassed

A-2589-24

plaintiff remotely by turning off her cell phone and accounts. In sum, plaintiff presented sufficient credible evidence to support her allegation of harassment and the need for an FRO. The judge properly analyzed both <u>Silver</u> prongs, and we see no evidentiary errors, oversight, or abuse of discretion.

IV.

Finally, defendant argues the judge abused her discretion by not adjourning the FRO hearing and relying on electronic evidence rather than hard copies. In particular, defendant maintains his due process rights were violated because the judge allowed plaintiff to proffer evidence through her laptop and an iPad in violation of N.J.R.E. 1001. We disagree.

We evaluate defendant's argument after considering the applicable evidentiary rules. First, N.J.R.E. 1001 defines "writings," which includes records, as defined in N.J.R.E. 801(e). Second, with respect to electronically created documents, any printout or other output readable by sight, shown to reflect data accurately, is an "original." N.J.R.E. 1001(c).

N.J.R.E. 801(e) includes electronic communications as acceptable forms of evidence, as the Rule provides "[a] 'writing' consists of . . . letters, words, . . . photographs . . . or combinations thereof or their equivalent, set down or recorded by . . . mechanical or electronic recording, or by any other means, and

preserved in a perceptible form, and their duplicates as defined by [N.J.R.E.] 1001(d)."

Defendant argues he should have been afforded the opportunity to obtain and examine hard copies of plaintiff's evidence, and the judge's failure to avail him of this opportunity "negatively impacted" his ability to review the "full evidence" plaintiff provided. Further, defendant asserts plaintiff had ample opportunity to obtain hard copies since the FRO hearing had been adjourned previously to allow her to amend the TRO. We note defendant does not challenge the authenticity of plaintiff's evidence.

We discern no reversible evidentiary ruling. The trial transcript establishes the judge reviewed the photographs and text messages and described them for the record. Defendant did not object to the photographs or text messages being provided to the judge. Therefore, we reject defendant's argument that the photographs and text messages were not properly in evidence, N.J.R.E. 901; see also State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999) (explaining that "[o]nce a prima facie showing [of authentication] is made, the writing or statement is admissible"). Defendant was permitted to cross-examine plaintiff as to the photographs and text messages, and therefore, there was no abuse of discretion by the judge. See L.M.F., 421 N.J. Super. at 528.

21

We have carefully reviewed the record in light of defendant's arguments and are satisfied the judge sufficiently assessed the testimonial evidence and exhibits in making her factual findings. We see no basis to disturb her conclusions regarding the admissibility of the challenged evidence, including the applicability of N.J.R.E. 1001, as her findings were supported by substantial, credible evidence contained in the record.

To the extent we have not specifically addressed any of defendant's arguments, it is because we conclude they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2589-24