# RECORD IMPOUNDED

> **NOT FOR PUBLICATION WITHOUT THE
> APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0250-21

A.M.O.,[1]

    Plaintiff-Respondent,

v.

J.W.O., JR.,

    Defendant-Appellant.

_____

Submitted September 14, 2022 – Decided September 22, 2022

Before Judges Firko and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FV-21-0101-22.

Gruber, Colabella, Liuzza, Thompson & Hiben, attorneys for appellant (Kristen C. Montella, of counsel and on the briefs).

Celli, Schlossberg, De Meo & Giusti, PC, attorneys for respondent (Vincent P. Celli, of counsel and on the brief).

---

[1] We use initials to protect plaintiff's confidentiality. R. 1:38-3(c)(12).

PER CURIAM

Defendant J.W.O. appeals from an August 13, 2021 final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on the predicate act of harassment, N.J.S.A. 2C:33-4(a) and (b). The Family Part judge determined an FRO was necessary to protect plaintiff from future acts of domestic violence. The judge also awarded plaintiff $7,815 in counsel fees as compensatory damages under N.J.S.A. 2C:25-29(b)(4).

On appeal, defendant contends there is insufficient evidence supporting the court's finding he committed the predicate act of harassment and therefore, the court erred by concluding an FRO is necessary to protect plaintiff from future acts of domestic violence. He also challenges the counsel fee award to plaintiff as unreasonable. Unconvinced, we affirm.

I.

The facts were established at the two-day bench trial in August 2021. Represented by counsel, plaintiff testified on her own behalf and introduced into evidence several exhibits. Defendant was also represented by counsel, testified on his own behalf, and moved items into evidence. He also called his mother and plaintiff's father as witnesses.

A-0250-21

The parties were married in October 2019. They adopted plaintiff's two nieces, ages thirteen and eight, in April 2021. On June 9, 2021, defendant filed a complaint for divorce.[2] On July 1, 2021, plaintiff filed a domestic violence complaint and was issued a temporary restraining order (TRO). She alleged after moving out of the marital home with the two children, defendant sent her multiple text messages and verbally abused her, even after she asked him to cease contacting her. In addition, plaintiff alleged defendant incessantly called the children, who cried after speaking with him. In terms of a prior history of domestic violence, plaintiff asserted defendant "mental[ly] and verbal[ly] abuse[d]" her "for over a year," which "escalate[d] to being violent and throwing and breaking thin[g]s."

On July 28, 2021, plaintiff amended her complaint to include that on July 26, 2021, defendant called her in violation of the TRO. In terms of prior history, plaintiff added that on February 28, 2021, while on the way to their daughter's birthday party at a bowling alley, defendant called plaintiff a "cheating whore" and "a piece of shit" in front of the children, family members, and friends. After returning home, plaintiff sent the children to a neighbor's house to shield them from defendant's anger. When plaintiff left the house to pick up the children,

---

[2] The record does not indicate the status of the divorce proceedings.

defendant locked them out using a chain lock. After plaintiff was able to remove the chain lock and re-gain entry into the house, she observed items on her vanity had been broken and "the force of [defendant] throwing things knocked a basket into [a] wall, creating a hole." Thereafter, defendant called plaintiff repeatedly and threatened to file for divorce, cancel the lease for her car, and stop the adoption of her nieces.

The amended complaint also alleged on April 15, 2021, plaintiff made plans with a friend "to avoid arguing" with defendant when he came home from work since he was "extremely irritable and cranky" from being "written up" at work. Despite plaintiff's change of plans, defendant contacted her friend and tracked the location of her car. Defendant accused plaintiff of being a bad mother and threatened to break her father's jaw. Although her plans changed, plaintiff did not communicate the change to defendant. He proceeded to verify her plans with that friend, track the location of plaintiff's car, and texted her a picture of the address where the car was parked.

Plaintiff also contends that one week before their wedding, defendant monitored her phone calls and her vehicle's OnStar whereabouts. Plaintiff, who is a certified peer recovery specialist, also visited an ex-boyfriend, who contacted her because he was suicidal and contemplating illicit drug use.

4

Plaintiff "lied" to defendant about where she was, fearful he would not understand. After plaintiff later explained the circumstances to defendant, he took plaintiff's engagement ring and threw it into the woods.

At trial, plaintiff testified to the allegations set forth in her complaints. She explained that when defendant verbally attacked her, she felt "physically ill," "intimidated," "terrified," "completely controlled[,] and helpless." Plaintiff also explained that when defendant threatened to stop the adoption of her nieces, she felt "manipulate[d]" to "do[,] say[,] or behave" how he wanted her to.

Plaintiff also provided background on her nieces' adoption. Their father, plaintiff's brother, committed suicide and the children's mother was a drug addict. The children were placed in the foster system in Florida, where her brother lived. Two years later, the parties were able to foster the children with the goal of adopting them.

Moreover, plaintiff clarified why she called the police on April 3, 2021, but hung up immediately. She explained she was afraid because defendant was so angry that he was "beat-red," "fuming," and yelling "in [her] face." When she called the police, she hung up immediately because "[the parties] had not completed the adoption yet, so [she] was fearful of what a domestic violence call would cause with the adoption."

A-0250-21

On cross-examination, plaintiff clarified although she moved out without telling defendant that day, they talked about her moving out at his request. When asked, she denied getting "so drunk" that defendant had to drive the parties' children home. Additionally, she explained that she withheld who she went out with because defendant had a tendency to contact the person and harass them. Finally, plaintiff testified that she asked defendant to disable the OnStar system and remove the application he used to track her, but he refused.

Defendant testified next. He began with July 1, 2021, the day plaintiff moved out. He confirmed the parties previously discussed plaintiff moving out, but not on that day. When he discovered plaintiff moved out, he was surprised and very upset. He claimed no parenting plan was in place, and the house was in "disarray." Afterward, he called plaintiff and spoke with the children, but he did not call the children directly.

In terms of prior history, defendant testified he never "hit or physically harmed" plaintiff or even "threatened to hit her." According to defendant, he caught plaintiff cheating on him several times. When plaintiff's counsel objected to this line of questioning, defendant called him a "jackass," and later apologized.

6

Regarding the February 28, 2021 incident, defendant confirmed the parties argued in the car. However, defendant initially did not recall throwing things later that night and creating a hole in a wall of the home, but later he speculated someone, perhaps himself, tripped and fell into the wall, creating the hole.

As for the April 3, 2021 incident, defendant did not deny calling plaintiff and leaving a voicemail, and he confirmed that the parties had a confrontation when plaintiff arrived home after midnight from a bar with "the smell of alcohol on her breath." He explained that plaintiff appeared inebriated, and they were in the kitchen, where "[t]he argument escalated" into the parties yelling at one another and plaintiff "trying to get [defendant] to hit her." Following a colloquy between counsel and the judge, defendant changed his testimony, stating that he was in the living room and plaintiff was in the kitchen during the argument.

Defendant testified he ran away screaming into a bedroom, before the argument moved back into the living room, and the police were called. He "declined to file charges . . . because of the adoption." Defendant lamented about some of the things he said, including threatening to break plaintiff's father's jaw, stating "it was wrong for [him] to say" that and he "should[ not] have said [those things] but again, it[ has] been a very, very difficult situation."

A-0250-21

Addressing the April 14, 2021 incident, defendant explained he was having "issues" at work and he wanted to be alone; but, when he told plaintiff he wanted to go out, "she freaked out and . . . had a tantrum" because she made plans with a friend. That upset him "[v]ery much." When plaintiff left, defendant reached out to that friend to verify plaintiff's story, who stated they "never had plans" other than "to get together soon." Then, defendant admittedly tracked plaintiff's vehicle on the OnStar system, searched the address of where it was located online, and sent her a link to the address he found.

Defendant also confirmed he told plaintiff he was going to stop the adoption. He explained he was concerned with plaintiff's "very dysfunctional behavior with her going out doing what she was doing and . . . it was[ not] working." Finally, defendant testified that he accidentally called plaintiff after the TRO was entered, but he hung up immediately and the call never even registered on his phone bill.

On cross-examination, defendant admitted he wrote a barrage of text messages to plaintiff the day she moved out, including: "Who the fuck was in my house[?]" and "You are a pathetic and horrible example." He also conceded that he "very well may have" made a hole in a wall of the parties' home. As for the incident in October 2019, he claimed that he did not track plaintiff, rather

8

the two sat down and "looked at the [OnStar application] together." He confirmed driving toward plaintiff's ex-boyfriend's home and claimed she voluntarily joined him.

Defendant's mother testified that when she contacted plaintiff, it was not on defendant's behalf. Plaintiff's father testified that he called her and said she was "a bad mother" for "going out drinking" while the children were home.

After considering the testimony and evidence, including screenshots of text messages, transcripts of voicemail messages, phone bills, and photographs, the judge found plaintiff credible and did not accept defendant's version of events. In her opinion, the judge found plaintiff's "testimony was consistent[,]" "she was prepared[,]" and her recollection was "detailed and convincing[;]" whereas defendant was "emotional and unable to control himself[,]" "presented as paranoid about [plaintiff's] infidelity[,]" and his testimony was "inconsisten[t]." The judge provided examples, such as (1) defendant "calling plaintiff's counsel a jackass;" (2) defendant's inability to describe an incident that would confirm plaintiff cheated on him, let alone offer proof of infidelity; and (3) defendant initially denying he made a hole in the wall then admitting he may have done so.

9

Additionally, the trial judge considered the incident on July 1, 2021, in the context of the parties' marriage to determine that defendant harassed plaintiff. The judge acknowledged the uncontested facts that the parties argued, defendant drove plaintiff toward her ex-boyfriend's home, defendant threw her engagement ring into the woods, and he accused her of cheating on him. Additionally, the judge reasoned plaintiff likely felt her marriage to defendant improved her chances of adopting of her nieces. And, the judge accepted that plaintiff held back on reporting prior incidents of domestic violence because she thought doing so would harm the adoption process.

Turning to the incident on February 28, 2021, the judge found defendant questioned plaintiff's fidelity and the parties argued. Additionally, the judge found the argument escalated and defendant threw plaintiff's belongings around their home with enough force to create a hole in the wall. Addressing the April 3, 2021 incident, the judge noted defendant contacted plaintiff numerous times to identify her location and threatened to stop the adoption, cancel the lease to her car, and file for divorce.

As to the April 14, 2021 incident, the judge determined plaintiff did not inform defendant of her change of plans, he contacted her friend to verify plaintiff's truthfulness, and he also contacted plaintiff numerous times to

10

pinpoint her location. Additionally, defendant tracked plaintiff, and sent her a message with a link to where her car was parked.

The judge addressed the final incident on July 1, 2021, and concluded that, after plaintiff moved out, defendant sent her a series text messages in anger. The judge highlighted defendant did not stop and instead "ramped up with statements followed by multiple exclamation marks indicating outrage[,]" including that plaintiff was "pathetic and sick." Defendant sent "several more" messages, and finally, plaintiff blocked defendant's number.

The judge found defendant's anger "was not simply a situational, one-time event[,]" and that "calling plaintiff a piece of shit, pathetic, sick [was] menacing, demeaning and intended to harass [plaintiff] when she specifically asked [him] to stop." Defendant's anger caused plaintiff to be "terrified." Thus, the judge concluded that defendant harassed plaintiff, pursuant to N.J.S.A. 2C:33-4(a) and (b), considering "the history of domestic violence, the hostile tone of communications, [and] the course language defendant used against [plaintiff]." The judge continued:

> [P]laintiff repeatedly testified she is scared of and intimidated by defendant. She is no doubt fearful of how far defendant's verbal threats will go.
>
> Plaintiff did not just say these magical words. She credibly explained the physical [e]ffects that

> [defendant's] words have on her. She testified that she has a physical, adverse reaction to defendant's verbal abuse.
>
> She becomes physically ill with anxiety. She explained she has been dealing with the verbal abuse for years and it has increased in intensity over the last six months.
>
> Now, that she has finally, physically separated from [defendant] she still does not feel safe. It [is] unclear whether the July 26[] missed call from defendant memorialized in [p]laintiff's Exhibit D . . . but the need to stop defendant from harassing plaintiff remains.
>
> She has asked defendant to stop his behaviors, attorneys have intervened, but nothing has stopped defendant's harassment other than the [TRO].

The judge applied the two-prong test under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006) and concluded there was a need for plaintiff to be granted an FRO. Before the hearing concluded, the judge granted leave for plaintiff's counsel to file a certification of services within seven days and instructed defendant to respond by August 25, 2021.

Plaintiff's counsel timely submitted a certification of services and requested $7,815 in fees. The certification detailed the aggregate amount of time spent by each individual at his firm on the matter and their hourly rates. Counsel also certified as to the requisite Rule 4:42-9(b) and RPC 1.5 factors.

Defendant did not file opposition. On August 30, 2021, the judge awarded the $7,815 requested amount in counsel fees to plaintiff.

Specifically, the judge explained that each attorney's hourly rate was "very reasonable" considering their "experience and reputation," "prevailing rates," and "the quality of work performed." The judge noted that counsel reduced his rate by $100 per hour less than plaintiff agreed to in the retainer agreement. Additionally, the judge acknowledged that the time for each service rendered was not itemized, but found the total amount charged (26.65 hours) to be reasonable considering the services "involved client conferences, review of the domestic violence complaint and amended temporary restraining order, communication with the adversary and court, review of proposed consent order, trial and exhibit preparation, appearance at a full-day trial and final decision, and drafting of a certification of legal services."

The judge also recognized that plaintiff was successful in obtaining an FRO and the fee charged by counsel was "fixed."[3] And, the judge found counsel was not precluded from accepting other employment, but did set aside other matters to prioritize plaintiff's trial. The judge noted that counsel was also

_____

[3] It appears the judge was referring to a fixed hourly fee rather than a fixed flat-fee.

A-0250-21

"represent[ing] plaintiff in a concurrent matrimonial action against defendant." The judge determined factors one, two, three, four, seven, and eight favored awarding counsel fees, and factors five and six were not applicable. A memorializing order was entered. This appeal followed.

## II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J.

474, 484 (1974)). However, we do not accord such deference to legal conclusions and will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

When determining whether to grant an FRO pursuant to the PDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). Here, plaintiff alleged that defendant engaged in harassment.

A-0250-21

A person is guilty of harassment where, "with purpose to harass another," they:

> a. Make or cause to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subject another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engage in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

Harassment requires the defendant to act with the purpose of harassing the victim. See J.D., 207 N.J. at 487. A judge may use "[c]ommon sense and experience" when determining a defendant's intent. Hoffman, 149 N.J. at 577.

Under the second Silver prong, a judge must also determine "whether a restraining order is necessary . . . to protect the [plaintiff] from" future acts or threats of violence. 387 N.J. Super. at 127. The commission of one of the predicate acts of domestic violence set forth in N.J.S.A. 2C:25-19(a) does not, on its own, "automatically . . . warrant the issuance of a domestic violence [restraining] order." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). Although that determination "is most often perfunctory and self-evident,

the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citation omitted).

Physical abuse is not the only type of domestic violence contemplated by the PDVA; the Act is also designed to address emotional abuse. See R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (finding an FRO is warranted where the defendant's conduct is "imbued by a desire to abuse or control the [plaintiff]") (emphasis added) (citing Silver, 387 N.J. Super. at 126-27). Here, the judge found the FRO was necessary to protect plaintiff by relying on her credible testimony that she was frightened by defendant's behavior.

Defendant claims there is insufficient evidence supporting the court's finding he committed predicate acts of harassment. More particularly, he argues the record lacks evidence he acted with the purpose to harass plaintiff and the judge did not provide sufficient findings. He contends his language "could be classified as harassment" but "it was domestic contretemps rather than done with a purpose to harass [p]laintiff." Defendant also challenges the judge's finding that his testimony was less credible than plaintiff's testimony, and he denied causing the hole in the wall because the photographs admitted into evidence are

undated and plaintiff is messy. Defendant also asserts plaintiff was not in "immediate danger" because she moved out of the marital home, their situation "de-escalated," and issuance of an FRO was unwarranted. We disagree.

Although harassment is "one of the most frequently reported" predicate acts of domestic violence, it also "presents the greatest challenges to our courts." J.D., 207 N.J. at 475. A harassment claim presents such a challenge because it "confounds [the court's] ability to fix clear rules of application" between "acts that constitute harassment" and acts that are "ordinary domestic contretemps." L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 534 (App. Div. 2011) (quoting J.D., 207 N.J. at 475). To determine whether conduct constitutes harassment in the domestic violence context, a court must consider the parties' prior relationship. Cesare, 154 N.J. at 405.

Only by considering the parties' prior relationship and the parties' conduct under the totality of the circumstances can a court determine whether a communication constituted harassment. Compare Pazienza v. Camarata, 381 N.J. Super. 173, 182-84 (App. Div. 2005) (finding, based on the defendant's repeated prior unwanted contact with the plaintiff, that a single text message to the plaintiff about the show she was watching at the moment the defendant sent the text message constituted harassment), with L.M.F., 421 N.J. Super. at 535-

37 (holding an isolated incident of the defendant making a remark to the plaintiff when he was angry, and they were divorcing was not harassment under the circumstances).

Critical to this analysis is whether the defendant's actions were taken with a purpose to harass. R.G., 449 N.J. Super. at 226. "'[P]urpose' is the highest form of mens rea contained in our penal code, and the most difficult to establish." State v. Duncan, 376 N.J. Super. 253, 262 (App. Div. 2005). "A person acts purposely with respect to the nature of [their] conduct or a result thereof if it is [their] conscious object to engage in conduct of that nature or to cause such a result." Id. (quoting N.J.S.A. 2C:2- 2(b)(1)). We may infer "a 'purpose to harass another' 'from the evidence presented' and from 'common sense and experience.'" Id. (quoting Hoffman, 149 N.J. at 577).

Here, defendant is correct the judge did not make a finding to support a determination that defendant offensively touched plaintiff or threatened to do so, under N.J.S.A. 2C:33-4(b). And, the record does not support such a determination. Defendant's threat he would break plaintiff's father's jaw was directed at plaintiff and is relevant to claims that he violated N.J.S.A. 2C:33-4(a) (communications) and (c) (other alarming conduct), but not 4(b) (threats of bodily harm). See D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994)

19

(considering whether defendant violated only N.J.S.A. 2C:33-4(a) and (c) where he told plaintiff, the mother of his child, that he would "put [his] foot up [her partner's] butt").

However, the evidence amply supports the judge's finding defendant made communications likely to cause annoyance or alarm, and at the same time, engaged in a course of alarming conduct and repeatedly committed acts with the purpose to alarm and seriously annoy plaintiff. Defendant's purpose is established by his own words and conduct and buttressed by the call logs, voicemail transcripts, and screenshots of text messages in evidence. The frequency, volume, and vulgar content of those communications support a finding of harassment under N.J.S.A. 2C:33-4(a).

Applying the governing principles under Silver, the judge concluded there was a need for plaintiff to be granted an FRO. The judge also considered the factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6):

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29.]

The judge may also look to other relevant factors not included in the statute. See N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015). This "second prong set forth in Silver requires [that] the conduct [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (emphasis added); see also Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995) (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims"). Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties." Cesare, 154 N.J. at 405.

As noted, among the factors to be considered is the parties' previous history of abuse. Cesare, 154 N.J. at 401-02.

> The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present.

> This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which [a] defendant's acts must be evaluated.
>
> [R.G., 449 N.J. Super. at 228-29 (quoting Corrente, 281 N.J. Super. at 248) (citation omitted).]

Additionally, "whether the victim fears the defendant" is a factor the trial judge may consider upon an application for an FRO. See G.M., 453 N.J. Super. at 13 (considering victim's continued fear when modifying an FRO) (citation omitted).

Here, the judge correctly determined defendant's unrelenting course of conduct directed at plaintiff over a period of months despite her requests that he stop and his anger—which was not isolated—support the judge's finding an FRO was necessary to protect plaintiff against future acts of domestic violence. We conclude there is no basis to disturb the judge's factual findings or legal conclusions. The judge heard testimony from the parties and witnesses and had ample opportunity to assess credibility. There exists sufficient evidence in the record to support both Silver prongs, and we see no evidentiary errors, oversight, or abuse of discretion.

22

## III.

Lastly, we address the award of counsel fees to plaintiff. Defendant did not oppose plaintiff's application for counsel fees before the trial judge. Therefore, defendant's argument is waived. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Nonetheless, we add the following brief remarks.

Under the PDVA, counsel fees are deemed compensatory damages. N.J.S.A. 2C:25-29(b)(4). Defendant asserts the award of counsel fees was "unreasonable and not supported by the certification of attorney services." He also contends the judge did not analyze the RPC 1.5 factors; rather, she determined they are not applicable or applied them in a conclusory manner in favor of plaintiff. According to defendant, counsel's certification was inadequate because it did not set forth an itemization as to each individual's services or the amount of time spent on each task.

Compensatory damages, including reasonable counsel fees, may be awarded in domestic violence cases. McGowan v. O'Rourke, 391 N.J. Super. 502, 507-08 (App. Div. 2007). "The reasonableness of attorney's fees is determined by the [judge] considering the factors enumerated in R[ule] 4:42-9(b)." Id. at 508. Pursuant to Rule 4:42-9(b), an application for counsel fees

23

must address "the factors enumerated by RPC 1.5(a)[,]" and include "an itemization of disbursements for which reimbursement is sought." R. 4:42-9(b).

"The factors to be considered in determining the reasonableness of a fee," pursuant to RPC 1.5, include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]
>
> (8) whether the fee is fixed or contingent.
>
> [RPC 1.5.]

Moreover, an application for counsel fees may include compensation for paraprofessional services rendered if the certification includes "a detailed

statement of the time spent and services rendered by paraprofessionals, a summary of the paraprofessionals' qualifications, and the attorney's billing rate for paraprofessional services to clients generally." R. 4:42-9(b). The Rule defines "paraprofessional services" as "those services rendered by individuals who are qualified through education, work experience or training who perform specifically delegated tasks which are legal in nature under the direction and supervision of attorneys and which tasks an attorney would otherwise be obliged to perform." Ibid. Additionally, "[n]o portion of any fee allowance claimed for attorneys' services shall duplicate in any way the fees claimed by the attorney for paraprofessional services rendered to the client." Ibid.

Although an adequate certification of services must accompany an application for counsel fees, a technically deficient certification will not per se invalidate an award for counsel fees if the award was amply supported in the record. Elizabeth Bd. of Educ. v. N.J. Transit Corp., 342 N.J. Super. 262, 273 (App. Div. 2001). Even where an award was made without any affidavit or certification, the award may be upheld if the error in granting the award was harmless. Dotsko v. Dotsko, 244 N.J. Super. 668, 680 (App. Div. 1990).

Applying these controlling principles here, we discern no error. Counsel's certification provided details on the types of services rendered and the aggregate

amount of hours each individual expended on this case. Despite the technical deficiency of not providing a detailed statement of time expended for each service rendered, which the judge acknowledged, she was still able to find that the total time spent on the matter was reasonable.

Moreover, the judge considered that one attorney reduced his rate, which was below the prevailing rate for counsel with his level of experience. Additionally, contrary to defendant's argument, the judge also made necessary findings that correlated to each of the RPC 1.5 factors and noted two factors did not apply. Based on our review of the record, the judge properly awarded counsel fees to plaintiff under the PDVA. We find no abuse of discretion to warrant interference with the judge's decision.

To the extent we have not addressed defendant's other arguments, it is because they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-0250-21