# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3891-21

W.E.L.,

    Plaintiff-Respondent,

v.

C.K.W.,

    Defendant-Appellant.

_____

          Submitted November 28, 2023 – Decided January 10, 2024

          Before Judges Natali and Puglisi.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-0032-23.

          Andrew K. De Heer, attorney for appellant.

          Respondent has not filed a brief.

PER CURIAM

Defendant C.K.W.[1] appeals from a July 12, 2022, Family Part order, granting plaintiff W.E.L.'s application for a final restraining order (FRO) pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

On July 3, 2022, plaintiff filed a complaint seeking a temporary restraining order (TRO) against defendant alleging she had committed acts of domestic violence against him, specifically harassment and criminal trespass, and seeking injunctive relief under the PDVA.[2]

On July 12, 2022, Judge Reema Scaramella conducted the FRO hearing, during which both parties appeared pro se. Prior to commencing the hearing, the judge advised defendant of her rights and the consequences if an FRO were entered against her, and defendant confirmed her understanding. The judge then asked defendant whether she had any questions about her rights, and defendant queried, "I just want to ask all these things that you read, is it going to affect me now or if I violate that restraining order?" The judge again explained the consequences of an FRO and the "greater consequences" for the violation of an

---

[1] We use initials to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

[2] Although the TRO was not included in defendant's appendix, we discern its factual basis from the record of the FRO hearing and the information contained in the FRO.

FRO. The judge then asked if she had any other questions, and defendant responded that she was "just surprised." When the judge indicated she could not hear her, defendant repeated, "I said nothing really. I'm just surprised." Defendant advised she was not seeking a lawyer to represent her in the proceedings, and the court continued with the FRO hearing.

Plaintiff testified he and defendant dated for approximately seven months, but did not live together, and the relationship mutually ended in June 2022. He testified to a prior incident of domestic violence that occurred about a month prior to the predicate act. During the prior incident, which happened after the relationship had ended, defendant insisted on going to plaintiff's apartment to return gifts he had given her the previous December. Plaintiff repeatedly told her not to come to his house and asked her instead to donate or discard the gifts. Despite plaintiff's multiple requests, defendant appeared at his apartment late one evening. After plaintiff took the gifts and closed the door, defendant knocked on the door again. To plaintiff, it appeared defendant wanted "closure," so he reiterated that the relationship was over. Although he did not feel threatened by the encounter, plaintiff told defendant not to come back to his apartment. She continued to contact him through text and voice mail messages, to which plaintiff did not respond. Plaintiff then blocked defendant's number from his phone.

A-3891-21

The incident that caused plaintiff to seek a TRO occurred on July 3, 2022. On that date, defendant again appeared uninvited and unannounced at plaintiff's apartment, where he and his new girlfriend were spending the night. Defendant knocked "on all the windows and on all of the doors of the apartment" for fifteen minutes. Plaintiff eventually opened the back door, where defendant was standing on his patio. He testified to the incident:

> I said, you know, [w]hat are you doing here. She gave me a shirt that she had made—that a family member had made. I took the shirt just because I just wanted her to leave. She asked me if I wanted to go to the beach. I said no. That's not a good idea. She said, [w]hy not. I said, you know, I don't want to be with you. We've already established that fact well before she even came unannounced.
>
> . . . [T]here should have been no reason why she wanted to come over and then ask me to go out to the beach. I wanted nothing to do with the relationship. That's what I mean just by that statement is that we've already—we were broken up. Long story short. We were broken up. There should have been no reason for her to even come over.
>
> I—once I said no, it's not a good idea, she goes, [w]hy not. I said, I don't want to be with you because of the way you treated me. She didn't like that answer. She put her foot in the center of the sliding glass door to the patio. I said, [p]lease remove your foot. I said, I'm going to call the police. She said, [g]o ahead.
>
> At that point she forcefully entered my apartment. Now she is in the living room of my apartment. I specifically said, I'm going to call the police. Leave. Multiple

times. She said again, [g]o ahead and call the police. She then asked me do I have somebody here. I did not respond. At that point she ran to the bedroom where my girlfriend was sleeping.

. . . So while [defendant] was trying to run to the bedroom I'm trying to restrain her by holding her by the waist. I'm saying stop multiple times but she is continuing to press forward.

When she saw plaintiff's girlfriend in the bedroom, defendant exited the apartment and plaintiff locked the door behind her, engaged the security bar, and closed the blinds. Defendant continued to knock on the door for another ten minutes, until plaintiff called the police and officers arrived.

When asked by the court why he sought the FRO, plaintiff testified:

[W]hen it escalates to the second incident where you're putting your foot in the door, someone is telling you to remove your foot, I'm going to call the police and then you're telling them go ahead and then you . . . run into a room as if you're going to attack somebody you don't know, I mean that's cause for concern . . .

At the conclusion of plaintiff's testimony, the court asked defendant if she wished to cross-examine plaintiff, to which she responded no.

Defendant then testified on her own behalf. She stated that she went to plaintiff's apartment, at his request, to give him a traditional funeral cloth shirt for him to wear to her uncle's funeral in Sweden, which they had previously discussed attending together. When she arrived at the apartment, she knocked

5

on the windows and doors out of concern because plaintiff was not answering her and he had "suicidal tendencies" in the past.

When asked why she forced her way into the apartment, defendant responded, "Um, no reason. I just wanted to find out what was going on with him." When asked why she continued to stay in the apartment, she again said, "For no reason . . . I didn't think about anything in that moment." Defendant testified that after she asked plaintiff several times what was "going on," she asked whether he had someone in the bedroom and moved towards it. She admitted plaintiff physically held her back, but said when she saw a woman in the bedroom she decided to leave. She testified plaintiff roughly escorted her out of the apartment, which caused her slipper to come off her foot. She said she only remained at the apartment knocking on the doors because she wanted her slipper, which defendant returned to her just as the police arrived. She then asked the officer to retrieve the gifts she had previously returned to plaintiff during the prior incident, and the officer did so.

On cross-examination, defendant said she went to the apartment because she "just wanted to bring the shirt." She testified she had called plaintiff the day before and left a message, but plaintiff did not answer her calls. When asked by the judge what the purpose was in going into plaintiff's bedroom, defendant

6

responded, "I didn't have any purpose. I just wanted to know if he ha[d] somebody there."

After considering both parties' testimony, the court issued its oral decision on the record. First, the judge found the court had jurisdiction under the PVDA based on the parties' prior dating relationship. See N.J.S.A. 2C:25-19(d). The judge found plaintiff credible "in his recollection of the events, the way he maintained eye contact, his demeaner," and he was "consistent and . . . forthcoming in his testimony." The court found defendant not credible based on her conflicting testimony about her motivation for going to plaintiff's apartment:

> [S]he had stated that her original motivation for coming to the house was because she was concerned that he sounded suicidal. She hadn't heard from him and that he was, that her number was blocked and that she went to the home to see if he was okay. When I asked her again why she went to the house she said it was to drop off a shirt. And it doesn't seem credible. She already spoke to him five days prior. She knew he was okay. Even when he opened the door she knew that he was okay. She didn't need to come into the home and she came into the house.

The court found defendant committed the predicate act of harassment because she

> engaged in a course of conduct with the purpose and intent to seriously annoy and/or alarm and meaning to seriously annoy is to trouble, to weary, to bother and that's exactly what happened when she came into the home. And not only did she not leave but she

7

proceeded to walk through the house until the defendant had to threaten to call the police. She still stayed in the home. She still proceed[ed] to the bedroom, and she knew four weeks prior when she came to return some items [plaintiff] spoke with her and said, I don't want you to come back. It's not a good idea. Even he had no other contact with her except for one call where he stated that she had sent him a text inadvertently and he said, [s]top, this isn't meant for me. Stop texting me.

While the defendant claims that the [plaintiff] was in contact with her, she has no proof that she's demonstrated to the [c]ourt that that, in fact, happened even if it was a phone call. She has no proof that there was any exchange and I just don't find her testimony credible[.]

The court also found defendant committed the predicate act of criminal trespass, reasoning defendant "had actual notice to not come onto the property because [plaintiff] told [her] not to come and [she] came and . . . proceeded to enter the home when he was trying to close the door and told [her] not to come into the house."

In deciding whether to enter the FRO, the judge found there was "a continuing need for protection because the defendant won't leave the plaintiff alone" and, because defendant did not recognize the relationship with plaintiff was over, the situation was escalating. Therefore, the court entered the FRO against defendant.

A-3891-21

This appeal follows, wherein defendant raises the following issues for our consideration:

POINT I

THE TRIAL COURT'S DECISION FAILED TO MAKE STATUTORY FINDINGS OF THE PREDICATE ACT, PRIOR HISTORY OF DOMESTIC VIOLENCE AND THAT THE FRO WAS NECESSARY TO PROTECT THE SAFETY AND WELL-BEING OF THE PLAINTIFF.

POINT II

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY MISINTERPRETING THE STATUTORY DEFINITIONS OF HARASSMENT AND CRIMINAL TRESPASS.

POINT III

DID THE TRIAL COURT ABUSE ITS DISCRETION AND COMMIT REVERSIBLE ERROR IN FAILING TO OFFER THE DEFENDANT WITH OPPORTUNITY TO UTILIZE THE SERVICES OF AN INTEPRETER?

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Reversal is

only warranted when a trial court's findings are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).  Likewise, "if the court ignores applicable standards, we are compelled to reverse and remand for further proceedings." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008).

We also apply a deferential standard in reviewing factual findings by a judge.  Balducci v. Cige, 240 N.J. 574, 594 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019).  In an appeal from a non-jury trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015).  Deference is likewise given to credibility findings. State v. Hubbard, 222 N.J. 249, 264 (2015).  "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

"As to issues of law, however, our review is de novo: '[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Rowe v. Bell & Gossett Co.,

239 N.J. 531, 552 (2019) (quoting <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995)).

After considering defendant's arguments in light of the record and the applicable legal standards, we affirm substantially for the reasons articulated by Judge Scaramella in her oral decision. We add the following comments.

Under the first prong of <u>Silver v. Silver</u>, the court must determine whether plaintiff proved, by a preponderance of the credible evidence, defendant committed one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a). 387 N.J. Super. 112, 125 (App. Div. 2006).

Under N.J.S.A. 2C:33-4, a person commits the offense of harassment if, with purpose to harass another, she:

> a.　Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b.　Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c.　Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [<u>Model Jury Charges (Criminal)</u>, "Harassment (N.J.S.A. 2C:33-4)" (rev. Jan. 19, 2012).]

"Integral to a determination of harassment" is a finding by the trial court "that defendant acted with a purpose or intent to harass another." State v. Duncan, 376 N.J. Super. 253, 261 (App. Div. 2005). Subsection c requires a course of conduct, rather than a single communication. J.D. v. M.D.F., 207 N.J. 458, 477-78 (2011). A course of conduct may consist of conduct that is alarming or it may be a series of repeated acts if done with the purpose "to alarm or seriously annoy" the intended victim. N.J.S.A. 2C:33-4 cmt. 3. Serious annoyance or alarm includes "to weary, worry, trouble or offend." J.D. v. M.D.F., 207 N.J. at 478. Subsection c requires proof that the defendant "reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy." State v. Burkert, 231 N.J. 257, 284-85 (2017).

Under N.J.S.A. 2C:18-3, a person commits an offense of criminal trespass if, knowing that she is not licensed or privileged to do so, she enters or surreptitiously remains in any research facility, structure or separately secured or occupied portion thereof. A charge of criminal trespass requires proof:

>    (1)    That the defendant entered or surreptitiously remained in a structure, and

>    (2)    That the defendant did so knowing that she had no right to enter or to be there at that time.

[Model Jury Charges (Criminal), "Criminal Trespass (N.J.S.A. 2C:18-3(a))" (rev. Oct. 1, 2001).]

The record supports the court's finding defendant committed acts of harassment and criminal trespass. Plaintiff's credible testimony established defendant went to his home unannounced and uninvited, a month after he had advised her not to go his residence or contact him. She admitted she knocked on the doors and windows, forced her way into his home, and refused to leave until she saw a woman in plaintiff's bedroom.

Under the second prong of Silver, the judge must determine whether the court should enter a restraining order that provides protection for the victim. Silver, 387 N.J. Super. at 126. Here, the judge found defendant's conduct was escalating and reasonably placed plaintiff in fear for his safety such that an FRO was necessary in order to protect plaintiff from future acts of domestic violence. We discern no abuse of discretion in the court's determinations of credibility and factual findings, nor any error in her legal conclusions that a restraining order should issue.

We likewise reject defendant's contention the court's failure to offer her the services of an interpreter placed her at a disadvantage and violated her due process right to a fair trial. "A trial judge has broad discretion in controlling the courtroom and court proceedings." State v. Juracan-Juracan, 255 N.J. 241, 250

(2023). "The decision as to whether an interpreter is required . . . will not be disturbed on appeal unless an abuse of discretion is manifest." Ibid. (quoting State in Int. of R.R., 79 N.J. 97, 117 (1979)). "The spoken word is unquestionably the principal method of communication during in-court proceedings, so a participant's ability to understand and communicate through language is key to ensuring fairness of the proceedings." Id. at 251.

Defendant stated she understood her rights and the potential consequences of an FRO, understood and waived her right to cross-examine plaintiff, and answered both plaintiff's cross-examination and the judge's questions without any difficulty. Because the record is devoid of any indication defendant was unable to understand the proceedings and communicate effectively with the court, the judge did not abuse her discretion by not offering defendant the assistance of an interpreter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3891-21