**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2678-23

R.M.C.,[1]

    Plaintiff-Respondent,

v.

W.K.,

    Defendant-Appellant.

_____

       Submitted May 13, 2025 – Decided May 28, 2025

       Before Judges Firko and Augostini.

       On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1224-24.

       Zeller & Wieliczko, LLP, attorneys for appellant (Dean R. Wittman, on the briefs).

       Stockton Family Law, LLC, attorneys for respondent (Kathleen Pasquarello Stockton, on the brief).

PER CURIAM

---

[1] We use initials to identify the parties in accordance with Rule 1:38-3(d)(10).

Defendant W.K. appeals from a March 26, 2024 final restraining order (FRO) entered in favor of plaintiff R.M.C., his former girlfriend, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on the predicate act of harassment, N.J.S.A. 2C:33-4. Because the judge's finding of harassment and plaintiff's need for an FRO was grounded in substantial, credible evidence in the record, we affirm entry of the FRO. However, we reverse and remand the $5,250 counsel fee award because the judge erred in awarding fees based solely on an oral application and by not requiring an affidavit of services under Rule 4:42-9(b).

## I.

The following facts are derived from the FRO trial. Both parties were represented by counsel. Plaintiff and defendant were the only witnesses who testified. The parties met while both were employees at a high school. They began dating in 2020 for "about a year" and broke up for the first time in September 2021. Plaintiff testified they got back together "officially" in August 2022 and broke up a year later.

On January 6, 2024, plaintiff obtained a temporary restraining order (TRO), alleging that defendant harassed her by contacting her repeatedly by text messages, Facebook Messenger, Instagram, Snapchat, and WhatsApp,

continuing a pattern of prior abuse. Plaintiff did not block defendant from her personal email account because she did not have "push" notifications on her cell phone and not blocking defendant on email was "helpful to know when he was going through moments where he was feeling angry" towards her, and she could "keep an extra eye over [her] shoulder." Plaintiff alleged defendant "displays very clear emotional instability." By way of example, plaintiff alleged he "friended" her on Venmo and reviewed her transaction history back to 2016. Plaintiff also alleged defendant sent her screenshots of transactions that he believed "proved" she was hiding her "sexual orientation."

Plaintiff subsequently amended the TRO to add a history of domestic violence. Plaintiff alleged the parties' went to a comedy show called "Couples Therapy" in March 2023 in Philadelphia, Pennsylvania. After the show, while defendant was driving, plaintiff claimed he "yell[ed]" at her and accused her of being in love with other people. Because she was scared, plaintiff climbed into the back seat. Plaintiff asked defendant to pull over repeatedly, but he refused and got into a car accident. Defendant then drove the wrong way down a one-way street. Plaintiff recorded the incident on her video camera, and in the video stated, "I really hope I don't die," and "It's not the first time I've had that

3

thought." Plaintiff alleged after defendant's "continued gaslighting" that she was terrified.

In her amended complaint, plaintiff also alleged that on March 17, 2023, defendant accused her of having "a thing" with one of his male friends. On March 25 and 26, 2023, plaintiff also alleged the parties went to an exhibit and a bar. After his cell phone died, plaintiff alleged defendant yelled at her in the bar, the streets, and later at his home. Similar incidents occurred in the ensuing months.

For example, in July 2023, the parties were at the shore with defendant's family. According to plaintiff, defendant woke everyone up at 4:00 a.m. after searching plaintiff's cell phone and discovering she met an old friend for a drink after the parties broke up. Defendant's parents and brother tried to calm him down but were unsuccessful. Defendant's brother had to wrestle and hit him in response.

At the two-day FRO hearing, plaintiff described the allegations in her amended complaint. She also testified about the parties' trip to Jamaica in August 2023. Defendant woke plaintiff up at 6:00 a.m. and made accusations towards plaintiff about "being in love with somebody [she's] not in love with." He also wanted to know why she did not post pictures of them yet on social

media. Plaintiff testified that his emotional abuse led her to get a separate hotel room for her safety and break up with him during their trip. Plaintiff told defendant he was "crazy" and asked him to "get away." Plaintiff admitted to slapping defendant on his shoulders and the back of his head to get him away from her. Plaintiff stated defendant tracked her down at the resort, and at 2:00 a.m., pounded on her hotel room door. Defendant confronted plaintiff and accused her of having sex with resort staff in her hotel room.

In an audio and video recording played at the hearing, plaintiff is seen going into the bathroom to use the toilet. Plaintiff testified that defendant came into the bathroom, put his fingers between her legs, and swabbed her vagina "looking for semen, which was not there." Plaintiff testified defendant grabbed her and started smelling her "hips and pelvic area," claiming "somebody else's semen" was inside her. Plaintiff pushed defendant out of the way and ran out of the bathroom.

Plaintiff explained defendant started "screaming at the resort staff, which one of you f***** her[?]" Ultimately, plaintiff testified that resort staff got her away from defendant and took her to another room located on the other side of the resort. Plaintiff requested an FRO because she is "fearful" of defendant and there is "immediate danger" to her.

5

Defendant testified plaintiff mischaracterized the events that took place in Jamaica. After the parties broke up, defendant testified the parties continued to have contact and were intimate twice thereafter. Defendant stated he felt "very confused" about where their relationship stood because plaintiff's actions were inconsistent with her words.

Defendant explained that at some point in September 2023, he was no longer blocked from texting and calling plaintiff. Defendant testified the parties often blocked each other and later unblocked each other on social media and other forms of electronic communication. He also mentioned that plaintiff came to see him at a brewery where he was working and gave him a kiss.

Counsel for both parties gave brief summations. Text messages, emails, and photographs were admitted into evidence. Following the parties' testimony and summations, the judge placed his decision on the record. The judge found jurisdiction was established under the PDVA based on the parties' former dating relationship. The judge determined harassment was proven based on plaintiff's credible testimony and evidence presented. The judge highlighted defendant's accusations against the hotel staff in Jamaica of having sex with plaintiff "is truly beyond obsession" and demonstrated a "pattern of coercive control over

6

the victim" as defined in the law, which became effective on January 8, 2024, N.J.S.A. 2C:25-29(a)(7).

The judge reasoned the "new law" describes coercive control as including but not limited to "monitoring a person's movements, communications, daily behavior, finances, economic resources, or access to services." The judge found plaintiff proved defendant exercised "coercive control" over her because there was not a "scintilla of evidence" to suggest plaintiff was unfaithful or in love with anyone else. The judge emphasized that the "obsessive component" was shown as evidenced by defendant's refusal to leave plaintiff alone after being contacted by her father, being blocked from social media and electronic communications, and getting such a "definitive request" from plaintiff herself.

Specifically addressing harassment under N.J.S.A. 2C:33-4(c), the judge determined that defendant engaged in a "course of alarming conduct or of repeatedly committed acts with the purpose to alarm or seriously annoy" plaintiff. The judge explained subsection (c) has been "construed" to address "repeated communications directed at a person that reasonably put that person in fear for his or her safety or security or that intolerably interfered with [his or her] reasonable expectation of privacy."

Regarding whether plaintiff required future protection, the judge found a significant history of domestic violence. Crediting plaintiff's testimony, the judge recounted the prior abuse and the escalation of communications from September 2023 to January 2024, showing defendant's anger and obsession with plaintiff, repeatedly accusing her of infidelity, being involved with other men, and being bisexual. The judge characterized defendant's behavior as "bizarre" and "disturbing." The judge reached the "inescapable conclusion" that only an FRO will prevent the "occurrence or reoccurrence of domestic violence."

At the close of trial, the judge addressed the issue of compensatory damages and counsel fees. Plaintiff's counsel requested permission to submit a certification of services,[2] but the judge chose to address the application without requiring the certification to be submitted. Defendant's counsel objected. The judge determined that fees in the amount of $5,250 were reasonable and ordered that amount to be paid within thirty days.

Defendant filed a motion for a stay with this court. We denied defendant's motion without prejudice because he failed to comply with Rule 2:9-5(a). This appeal followed.

---

[2] We use the terms "certification of services" and "affidavit of services" interchangeably in our opinion.

Before us, defendant argues there was insufficient evidence in the record for the judge to find harassment because the parties' arguments were not physical in nature. Defendant asserts his communications with plaintiff were not threatening, and he did not use coarse language. Defendant further contends there was insufficient evidence to warrant the issuance of an FRO. Finally, defendant claims the compensatory award of counsel fees to plaintiff was arbitrary and capricious, and unsupported by an affidavit of services.

II.

Our review of a trial court's decision to enter an FRO in a domestic violence matter is limited. Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005). "A reviewing court is bound by the trial court's findings 'when supported by adequate, substantial, credible evidence.'" Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "This deferential standard is even more appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"Reversal is warranted only when a mistake must have been made because the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the

interests of justice.'" Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we review de novo "the trial judge's legal conclusions, and the application of those conclusions to the facts . . . ." Ibid. (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

In adjudicating a domestic violence case, the trial judge has a "two-fold" task. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). "The judge must first determine whether the plaintiff has proven, by a preponderance of the evidence," that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a), which incorporates harassment, N.J.S.A. 2C:33-4, as conduct constituting domestic violence. Id. at 125-26. The judge must construe any such acts in light of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." Kanaszka v. Kunen, 313 N.J. Super. 600, 607 (App. Div. 1998); see N.J.S.A. 2C:25-29(a)(1).

A finding of harassment requires proof that the defendant acted "with purpose to harass." N.J.S.A. 2C:33-4; see Silver, 387 N.J. Super. at 124. Although a purpose to harass may, in some cases, be "inferred from the evidence," and may be informed by "[c]ommon sense and experience," a finding

10

by the court that the defendant acted with a purpose or intent to harass another is integral to a determination of harassment. State v. Hoffman, 149 N.J. 564, 577 (1997).

We note that purposeful conduct "is the highest form of mens rea contained in our penal code, and the most difficult to establish." State v. Duncan, 376 N.J. Super. 253, 262 (App. Div. 2005). Its establishment requires proof, in a case such as this, that it was the actor's "conscious object to engage in conduct of that nature or to cause [the intended] result." N.J.S.A. 2C:2-2(b)(1). A plaintiff's assertion that the conduct is harassing is not sufficient. J.D. v. M.D.F., 207 N.J. 458, 484 (2011). Further, a "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487.

When deciding the issues of intent and effect, we are mindful of the fact that

> harassment is the predicate offense that presents the greatest challenges to our courts as they strive to apply the underlying criminal statute that defines the offense to the realm of domestic discord. Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of "ordinary domestic contretemps" presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application.

[Id. at 475 (citation omitted).]

"[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive."  Id. at 484.

If a predicate offense is proven, the judge must then assess "whether a restraining order is necessary, upon an evaluation of the [factors] set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)[(7)], to protect the victim from an immediate danger or to prevent further abuse."  Id. at 475-76 (quoting Silver, 387 N.J. Super. at 127).  The factors which the court should consider include, but are not limited to:

> (1)  The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2)  The existence of immediate danger to person or property;
>
> (3)  The financial circumstances of the plaintiff and defendant;
>
> (4)  The best interests of the victim and any child;
>
> (5)  In determining custody and parenting time the protection of the victim's safety;
>
> (6)  The existence of a verifiable order of protection from another jurisdiction; and
>
> (7)  Any pattern of coercive control against a person that in purpose or effect unreasonably interferes

with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse. If the court finds that one or more factors of coercive control are more or less relevant than others, the court shall make specific written findings of fact and conclusions of law on the reasons why the court reached that conclusion. Coercive control may include, but shall not be limited to:

(a)    isolating the person from friends, relatives, transportation, medical care, or other source of support;

(b)    depriving the person of basic necessities;

(c)    monitoring the person's movements, communications, daily behavior, finances, economic resources, or access to services;

(d)    compelling the person by force, threat, or intimidation, including, but not limited to, threats based on actual or suspected immigration status;

(e)    threatening to make or making baseless reports to the police, courts, the Division of Child Protection and Permanency (DCPP) within the Department of Children and Families, the Board of Social Services, Immigration and Customs Enforcement (ICE), or other parties;

(f)    threatening to harm or kill the individual's relative or pet;

13

(g)  threatening to deny or interfere with an individual's custody or parenting time, other than through enforcement of a valid custody arrangement or court order pursuant to current law including, but not limited to, an order issued pursuant to Title 9 of the Revised Statutes; or

(h)  any other factors or circumstances that the court deems relevant or material.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 402 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment, and physical abuse," and on "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

The court must exercise care "to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div.

14

2017).    The PDVA is not intended to encompass "ordinary domestic contretemps."  Corrente, 281 N.J. Super. at 250.   Rather, "[t]he [PDVA] is intended to assist those who are truly the victims of domestic violence."  Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)).

Viewing the record in light of the applicable law, we discern no abuse of discretion in the judge's finding the predicate act of harassment.  The judge's determination rested on substantial, credible evidence that was properly admitted into the record.

Having found credible plaintiff's description of the parties' history, including their on and off dating relationship, the judge deemed defendant's repeated emails to plaintiff after being told not to contact her anymore, being blocked on her cell phone, and social media platforms, constituted "obsessive" and "alarming" behavior done with a purpose to harass.  The judge also found defendant was not credible and rejected his rationale that he was "participating in self-therapy of some kind" by contacting plaintiff for months after their break-up for the last time.  The judge found the communications were intended to annoy or alarm plaintiff and were not as defendant maintained "just an

15

ineffective way of journaling" and provide an "outlet" for him to deal with the parties' failed relationship.

Defendant also claims the judge erred because defendant's behavior was admittedly "immature and overbearing," but was ordinary domestic contretemps. Kamen, 332 N.J. Super. at 228-29. We are satisfied the judge considered the testimony and evidence and viewed the context and content of the messages, calls, and social media postings, in light of the parties' history, and reasonably inferred an intent to harass. See State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006) (determining "purpose may and often must be inferred from what is said and done and the surrounding circumstances").

We discern no error in that finding under N.J.S.A. 2C:33-4(c) and agree that defendant's statements were not, therefore, domestic contretemps. His words and behavior were instead transformed into harassing communications by defendant's proven intent. See State v. L.C., 283 N.J. Super. 441, 450 (App. Div. 1995) (recognizing N.J.S.A. 2C:33-4 "does not proscribe mere speech, use of language, or other forms of expression," if the purpose to harass is shown).

We likewise consider and reject defendant's claim that the judge improperly evaluated prong two of Silver and the relevant statutory factors. 387 N.J. Super. at 126. Here, the judge expressly analyzed Silver and the factors set

forth in N.J.S.A. 2C:25-29(a), and made findings supported by the record. The judge explained his finding that defendant was "obsessed" with plaintiff and engaged in "disturbing" and "frightening" behavior. The judge placed great weight in the audio and video recording played at the hearing and noted he "really had a difficult time digesting it at one point."

The judge noted the parties' history showed plaintiff "had taken the verbally abusive conduct" of defendant, being "repeatedly accused of infidelity," being "exposed to his erratic conduct" in the March 2023 "car ride," and wanted to be "left alone." The history of domestic violence in conjunction with the email messages, defendant's continued "bizarre behavior," a termination of the parties' relationship, and the "pleas" of plaintiff's father to leave his daughter alone necessitated the entry of the FRO. The judge's concern was not mitigated after plaintiff blocked defendant's access. Thus, we perceive no basis to disturb the judge's finding plaintiff required protection and an FRO.

### III.

Lastly, defendant contends that the judge abused his discretion in awarding plaintiff $5,250 in attorney's fees for prevailing in the FRO hearing by failing to require an affidavit of services. We agree.

The PDVA, N.J.S.A. 2C:25-17 to -35, explicitly authorizes courts to award "reasonable attorney's fees" to victims. N.J.S.A. 2C:25-29(b)(4). The statute reads in pertinent part:

> (b) In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse . . . . At the hearing the judge of the Family Part of the Chancery Division of the Superior Court may issue an order granting any or all of the following relief:
>
> . . . .
>
> (4) An order requiring the defendant to pay to the victim monetary compensation for losses suffered as a direct result of the act of domestic violence . . . [c]ompensatory losses shall include, but not be limited to . . . reasonable attorney's fees . . . .
>
> [N.J.S.A. 2C:25-29(b)(4) (Emphasis added).]

This provision serves a critical public policy goal: "to avoid a chilling effect on the willingness of domestic violence victims to come forward with their complaints." M.W. v. R.L., 286 N.J. Super. 408, 411 (App. Div. 1995).

Because fees and costs in a domestic violence action are awarded as damages, an award is "not subject to the traditional analysis" for an award of fees in family-type claims pursuant to N.J.S.A. 2A:34-23, and the court is not obliged to consider the parties' financial circumstances. McGowan v. O'Rourke,

391 N.J. Super. 502, 507 (App. Div. 2007) (quoting Schmidt v. Schmidt, 262 N.J. Super. 451, 453 (Ch. Div. 1992)); see also Wine v. Quezada, 379 N.J. Super. 287, 292 (Ch. Div. 2005).

Rather, under the PDVA, counsel fees maybe be awarded if the fees are: (1) "a direct result of the domestic violence"; (2) reasonable; and (3) presented via affidavit pursuant to Rule 4:42-9(b). McGowan, 391 N.J. Super. at 507 (quoting Schmidt, 262 N.J. Super. at 454); see also Wine, 379 N.J. Super. at 291.

Rule 4:42-9 sets forth the requirements necessary to support an application for attorney's fees. In pertinent part, Rule 4:42-9(b) states:

> [A]ll applications for the allowance of fees shall be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a). The affidavit shall also include a recitation of other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, and itemization of disbursements for which reimbursement is sought.
>
> [(Emphasis added).]

RPC 1.5(a) recites the factors to be addressed in the Rule 4:42-9(b) affidavit:

> (1)    the time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal service properly;

(2)　the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)　the fee customarily charged in the locality for similar legal services;

(4)　the amount involved and the results obtained;

(5)　the time limitations imposed by the client or by the circumstances;

(6)　the nature and length of the professional relationship with the client;

(7)　the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)　whether the fee is fixed or contingent.

Here, the judge stated he was "familiar" with plaintiff's counsel and her "reputation," and the award of counsel fees for obtaining the FRO was "purely compensatory." The judge asked plaintiff's counsel on the record what her hourly billing rate was and the amount of preparation to prepare for the hearing. The judge did not review a certification of services or a retainer agreement and did not provide defendant an opportunity to object before awarding the counsel fee amount.

The judge abused his discretion by not requiring plaintiff's counsel to submit the requisite affidavit of services as mandated by Rule 4:42-9(b), which

explicitly requires all applications for the allowance of fees to be supported by an affidavit of services addressing the RPC 1.5(a) factors.  Therefore, we reverse and remand the $5,250 counsel fee award for compliance with <u>Rule</u> 4:42-9(b).

Affirmed in part, reversed and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2678-23